No. 2014-1699

# United States Court of Appeals for the Federal Circuit

TOMTOM, INC.,

*Plaintiff/Counterclaim Defendant - Appellee,*

v.

MICHAEL ADOLPH,

*Defendant/Counterclaimant - Appellant.*

*Appeal from the United States District Court for the Eastern District of Virginia, in Case No. 1:12-cv-00528-TSE-IDD, Judge T. S. Ellis, III*

## BRIEF OF DEFENDANT-APPELLANT MICHAEL ADOLPH

ANTIGONE GABRIELLA PEYTON
CLYDE E. FINDLEY
**CLOUDIGY LAW PLLC**
8300 Greensboro Drive, Suite 1250
McLean, VA 22102
(703) 436-2033

*Counsel for Defendant/ Counterclaimant – Appellant Michael Adolph*

October 10, 2014

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Michael Adolph certifies the following:

1.    The full name of every party represented by the undersigned counsel in this matter is:

Michael Adolph.

2.    The real party-in-interest (if the party named in the caption is not the real party in interest) represented by the undersigned counsel in this matter is:

None.

3.    All parent companies and any publicly held companies that own 10% or more of the stock of the parties represented by the undersigned counsel in this matter are:

None.

4.    The names of all law firms and the partners or associates that have appeared in the trial court on behalf of the party now represented by the undersigned counsel in this matter, or are expected to appear in this Court, are:

| CLOUDIGY LAW, PLLC: | WEISBROD, MATTEIS & COPLEY PLLC |
|---|---|
| Antigone Gabriella Peyton | Peter J. Toren |
| Clyde E. Findley | Derek Yoshio Sugimura |
| Jennifer Allen Sands Atkins | Timothy Marshall Belknap |
| Matthew Levy | William Edgar Copley |
| | Sean Jagger Williams |

Dated: October 10, 2014

*/s/ Antigone Gabriella Peyton*
Antigone Gabriella Peyton
CLOUDIGY LAW, PLLC

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................... i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES ............................................... vii

STATEMENT OF JURISDICTION ..................................................... 1

STATEMENT OF THE ISSUES .......................................................... 2

STATEMENT OF THE CASE .............................................................. 5

INTRODUCTION ............................................................................... 6

STATEMENT OF FACTS ................................................................. 10

    I.    THE '836 PATENT ................................................................ 10

        A.    Background of the Invention ................................. 10

        B.    The Patent Terms at Issue ..................................... 14

        C.    Prosecution History ............................................... 20

    II.    TOMTOM FILES AN OFFENSIVE SUIT AGAINST DR. ADOLPH ........... 26

SUMMARY OF THE ARGUMENT .................................................. 31

STANDARD OF REVIEW ................................................................ 32

ARGUMENT .................................................................................... 33

    I.    NODES CAN BE RECORDED AT LEAST AT PREDETERMINED TIME INTERVALS ................................................................. 33

        A.    Claim 1 Requires *Node* Data to be Collected at Least at Predetermined Time Intervals ................................. 35

        B.    The Specification Supports the Collection of *Node* Data at Predetermined Time Intervals ........................... 36

        C.    *Node* Data Is Equivalent to *Point* Data for Claim 1 .............. 38

D.    A *Node* is a Geographic Location ........................................... 39

E.    The District Court's Construction of *Node* Must Be Corrected ................................................................................ 41

II.    USING ONE PART OF A PREAMBLE TO PROVIDE ANTECEDENT BASIS CANNOT ALONE JUSTIFY CONVERTING OTHER UNRELATED PARTS OF THE PREAMBLE INTO NEW CLAIM LIMITATIONS .................................................................... 44

III.    A MOBILE UNIT CAN USE THE DATA IT GENERATES, EVEN WHEN THE DATA IS FIRST SENT TO AN EXTERNAL COMPUTER AND THEN RETURNED ...................................................... 48

IV.    DESTINATION TRACKING SYSTEM DOES NOT REQUIRE AN INITIAL MAP DATABASE.................................................... 51

V.    EACH TYPE OF DATA CAN BE STORED IN THE SAME DEVICE............ 53

CONCLUSION ................................................................... 58

ADDENDUM ...................................................................... A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Biocon, Inc. v. Struamann Co.,*
  441 F.3d 945 (Fed. Cir. 2006) ............................................................ 45, 47

*Butler v. David Shaw, Inc.,*
  72 F.3d 437 (4th Cir.1996) ...................................................................... 32

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
  289 F.3d 801 (Fed. Cir. 2002) ................................................................. 45

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
  134 S. Ct. 1744 (2014).............................................................................. 32

*Hill-Rom Services, Inc. v. Stryker Corp.,*
  755 F.3d 1367 (Fed. Cir., June 27, 2014)................................................. 40

*In re Kirkland,*
  600 F.3d 310 (4th Cir. 2010) ................................................................... 32

*In re Runski,*
  102 F.3d 744 (4th Cir. 1996) ................................................................... 32

*Liebel–Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) ............................................................ 39, 54

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,*
  744 F.3d 1272 (Fed. Cir. 2014) ............................................................... 32

*Mort Ranta v. Gorman,*
  721 F.3d 241 (4th Cir. 2013) ................................................................... 32

*Nellcor Puritan Bennett, Inc. v. Masimo Corp.,*
  402 F.3d 1364 (Fed. Cir. 2005) ............................................................... 32

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) .................................................... 28, 39, 54

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
  182 F.3d 1298 (Fed. Cir. 1999) ............................................................... 45

*Storage Tech. Corp. v. Cisco Sys., Inc.,*
  329 F.3d 823 (Fed. Cir. 2003) ................................................................. 32

*STX LLC. v. Brine,*
  211 F.3d 588 (Fed. Cir. 2000) ................................................................. 45

*Thorner v. Sony Computer Entm't Am. LLC,*
  669 F.3d 1362 (Fed. Cir. 2012) ....................................................... 29, 40, 54

*United Rentals, Inc. v. Angell,*
  592 F.3d 525 (4th Cir. 2010) ....................................................... 32

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ..................................................... 38

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442
  F.3d 1322 (Fed. Cir. 2006) ......................................................... 32

## Statutes

28 U.S.C. § 1295(a)(1) ............................................................ 1

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 1338(a) ............................................................... 1

35 U.S.C. § 102(b) ............................................................... 22

35 U.S.C. § 102(e) ............................................................... 25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| the '836 patent | U.S. Letters Patent No. 6,356,836, issued March 12, 2002 to Michael Adolph |
| A_____ | Joint Appendix page(s) |
| PTO | United States Patent and Trademark Office |
| District Court | United States District Court for the Eastern District of Virginia, Honorable T. S. Ellis, III presiding |
| Court | United States Court of Appeals for the Federal Circuit |

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, counsel for Defendant-Appellant Michael Adolph states that there has not been, nor is there currently, any other appeal in or from the same underlying civil action in this Court or in any other court of appeals.

**STATEMENT OF JURISDICTION**

This appeal arises from the following action in the United States District Court for the Eastern District of Virginia: *TomTom, Inc. v. AOT Systems GmbH*, 1:12-cv-00528. The underlying action concerned U.S. Patent No. 6,356,836, which was issued on March 12, 2002 to Defendant-Appellant Michael Adolph ("the '836 patent"). The District Court had subject matter jurisdiction over the underlying case pursuant to 28 U.S.C. §§ 1331 and 1338(a).

The District Court entered final judgment on July 8, 2014, based on the parties joint stipulated judgment filing. On August 7, 2014, Defendant Michael Adolph timely filed a notice of appeal, which this Court docketed on August 11, 2014. Dr. Adolph's appeal involves the District Court's final judgment, as well as all orders, opinions, and rulings underlying the judgment. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

1.      **"Node."**   The '836 patent specification explains that "nodes" are geographic locations that are recorded in three situations: (1) when a vehicle changes direction by more than a predetermined value, (2) at predetermined time intervals, or (3) after a vehicle has covered a certain distance. Claim 1 specifically requires travel data, in the form of nodes, to be collected "at least at predetermined time intervals." In light of this intrinsic record, did the District Court err in construing "node" in Claim 1 as a location recorded at a "point at which the vehicle changes direction by more than a predetermined value in a grid or road network," which excludes nodes that are locations recorded at predetermined time intervals or after a vehicle has covered a certain distance?

2.      **Preamble.**  When a preamble recites the purpose or intended use of an invention, does the reliance on one portion of the preamble because it provides the antecedent basis for structure recited in the body of the claim automatically convert other unrelated portions of the preamble into new substantive claim limitations?

3.      **"Generating and updating data for use in . . ."** In their summary judgment briefings, the parties disagreed about the meaning of the District Court's construction of part of the preamble, i.e., "the data generated and updated by the mobile unit *is used by that unit*." Adolph interpreted the District Court's ruling to

mean that a mobile unit satisfies this limitation even if data is first sent to an external computer and then returned to the unit for later use. TomTom disagreed, arguing that that the phrase "is used by that unit" means that the data must be used by the mobile unit immediately without any external processing. Claim 1 does not contain any limitations relating to processing data on an external computer—but dependent Claim 11 does. Should the District Court's construction of this phrase in Claim 1 be clarified?

4.     **"Destination tracking system of at least one mobile unit."**  Did the District Court properly interpret and apply the inventor's statements during prosecution when it construed the preamble language "destination tracking system of at least one mobile unit" as a system that "does not *contain*" an initial map database, based solely on the inventor's explanation during prosecution that the '836 patent's system does not *require* an initial map database to work, unlike the cited prior art, which would not function without an initial map database?

5.     **"Storing … data in the storage device."** Claim 1 of the '836 patent recites a step involving "storing traveled distance data in at least *one storage device*." Two subsequent limitations found in the body of this claim recite "storing section data in *the* storage device" and "storing the section data file in *the* storage device." Given this claim language, did the District Court err in ruling that each

- 3-

type of data (traveled distance data, section data, and section data file) identified in

Claim 1 must be stored in a *different* storage device?

## STATEMENT OF THE CASE

This is an appeal from the District Court's Order Entering Final Judgment of Non-Infringement.[1] After the District Court issued its claim construction memorandum and order,[2] the parties stipulated to non-infringement and requested dismissal of all remaining claims in order to allow the claim construction ruling to be appealed.[3] Following additional briefing, the District Court granted the parties' stipulation, dismissed the remaining claims, and entered final judgment on July 8, 2014.[4] Adolph timely filed a notice of appeal on August 7, 2014.[5]

---

[1] A32-34, Order (Dkt. No. 237) July 8, 2014; A35, Judgment (Dkt. No. 238) July 8, 2014.

[2] A1-29, Memorandum Opinion (Dkt. No. 198) Feb. 25, 2014; A30-31, Order (Dkt. No. 199) Feb. 25, 2014.

[3] A1101-8, Stipulation for Entry of Final Judgment (Dkt. No. 232) Jun. 18, 2014.

[4] A32-34, Order (Dkt. No. 237) July 8, 2014; A35, Judgment (Dkt. No. 238) July 8, 2014.

[5] A1109, Notice of Appeal (Dkt. No. 239) Aug. 7, 2014.

## INTRODUCTION

The world was different in June 1997 when Dr. Adolph filed the German priority application that led to the '836 patent. We did not have Twitter, mobile maps and traffic apps, or personal navigation devices ("PNDs") mounted in cars that would suggest the fastest route to a destination. We did have highly *in*accurate navigation and location-tracking technology in some vehicles. In those days, vehicle navigation systems ("nav systems") were of limited use because they relied on inaccurate and incomplete digital maps and inaccurate geographic location information collected from satellites. They also lacked accurate real-time traffic information, time-to-destination, and re-routing options. And they didn't have a process for updating the existing road network information to fix errors or extend the network when the vehicle traveled along new roads. Additionally, if a particular road or destination location was missing, the user could not program the systems to help them travel to that location—the nav system wouldn't work.

These early vehicle road maps came from two-dimensional paper maps that had been digitized to represent the road networks. They were projections, developed from manual surveying operations, had many errors, and were skewed by the printing process—paper maps did not have to be very accurate. Also, the data on these maps were out of date when they were printed, so the digital versions also contained an incomplete road network.

Additionally, the satellite systems that consumers and businesses rely on today were not being used effectively in the mid-1990s to collect location information for commercial use. Due to security concerns, the military would actually distort Global Positioning System ("GPS") location information randomly and insert outlier data so that "enemies" could not use the data to locate and attack important infrastructure. This meant that GPS-delivered location information often shifted by several meters, and if it were used to indicate a vehicle's location on a digitized map, the vehicle's location would not be accurately represented on an already inaccurate map. The commercial world would not make use of GPS technology for navigation or location purposes until the data became more accurate and many commercial satellites had been launched to provide broader coverage around the world. This did not occur until approximately the 2000-2001 time period.

In the early 1990s, Dr. Adolph drove over 40,000 km/year across Germany, and he found himself dissatisfied with the nav system technology that was available at the time. So he applied his background in mathematics and his understanding of graph theory to figure out why the existing nav systems were inadequate and highly inaccurate. He discovered that true digital maps (not converted paper maps) and accurate location information collected at specific time intervals and in a specific manner (to provide travel time) would provide a

solution. Dr. Adolph prepared and filed a patent application in Germany describing this solution, and later filed a U.S. application that issued as the '836 patent.

Nine years later, he read an article about TomTom's efforts to invest in better hardware for its navigation PNDs, which still used digitized maps and did not collect and store user data from vehicles' traveling along the road network for future use. So in June of 2006, he wrote a 5-page letter to TomTom's CEO explaining how TomTom could use his patented technology to improve its nav systems, and he attached the '836 patent cover page. TomTom's CEO shared that information with TomTom's product development team leaders, and approximately two months later, it issued a major software update. This update included new steps for storing travel data that includes geographic location information at 5-second time intervals and a process for sending that information back to TomTom for future use in updating maps and providing travel time and traffic information to its users. TomTom also filed a U.S. patent application on its navigation technology that cited only one U.S. patent—the '836 patent. TomTom's application never issued as a patent.

Years later, Dr. Adolph learned of TomTom's software improvement, which had been rolled out to all of its PNDs years ago and is now the pre-loaded mapping and travel app on Apple's iPhone. So Dr. Adolph's small company sued one of TomTom's device distributors, REWE, for patent infringement in Germany.

TomTom responded by filing a Declaratory Judgment action against Dr. Adolph and his company relating to the '836 patent in the United States. From that Declaratory Judgment action, this appeal was taken to seek review of the District Court's claim construction ruling.

# STATEMENT OF FACTS

## I.    The '836 Patent

This appeal focuses on claim construction issues relating to Claim 1 of United States Patent No. 6,356,836, entitled "Method and device for generating, merging, and updating of destination tracking data" ("the '836 patent"). This patent issued on March 12, 2002, to Defendant/Counterclaimant-Appellant Michael Adolph.

### A.    Background of the Invention

The '836 patent describes methods and devices for collecting certain travel data that can be used to provide a mobile unit with current accurate road network, route, and traffic information.[6] Prior methods and systems used for navigation were built on the theory that the available road network is essentially known and the digitized maps used to navigate that network are accurate.[7] Both premises were false, and the systems that made these assumptions were highly inaccurate and of limited utility to travelers trying to use them.

In the mid-1990's, when Dr. Adolph was traveling extensively across Germany, he became frustrated with the navigation technology available at the time and explored potential solutions. The existing systems's failures to provide

---

[6] A67.
[7] A75 at col. 3, ll. 13–17.

current or accurate route and travel time information meant that a system could not calculate the most efficient and fastest route to a destination available to them while traveling and, in some cases, couldn't even obtain route options if their destination didn't exist on the digitized base map.[8]

In the '836 patent, Dr. Adolph solved these problems by disclosing, for the first time, a new approach to generating, merging, and updating location and travel information using GPS and mobile devices that are in the vehicle with the traveler. His approach to travel data collection for future use provided important benefits: 1) it allowed a user to create a map from scratch automatically while traveling and to update existing maps to extend the known road network or correct errors; and 2) it enabled collection of travel data from a large number of users that could be combined to form an accurate picture of traffic patterns and current road networks.[9]

Before the '836 patent, digital maps were generally created by taking an existing two-dimensional paper map and converting it to a digital map that represents three dimensions on a globe.[10] As of 1997, when the priority patent

---

[8] A74 at col. 2, l. 61 – A75 at col. 3, l. 12.

[9] A75 at col. 3, l. 52-65; A75 at col. 4, ll. 24-28; A76 at col. 6, ll. 52-59.

[10] *See generally,* "Handbook on geographic information systems and digital mapping," United Nations Department of Economic and Social Affairs Statistics Division, Series F, No. 79, at 1-2 (2000), *available at*

application was filed, "[t]ypical navigation systems work[ed] by continuously analyzing the current location of a moving vehicle and comparing this position with a road network in the form of geographical data. This information can be read from a road map stored, for example, on a CD-ROM carried in the vehicle."[11] These digitized maps were difficult and expensive to update, contained incomplete road network information, and generally could not be updated directly by a mobile device.[12]

Any "GPS tracking device" uses the Global Positioning System, which currently uses a set of 32 satellites in orbit around Earth.[13] Each satellite sends broadcast messages, and each message contains information regarding the satellite's location and the time when the message is transmitted. As shown in Figure 1 below, if a GPS receiver can see at least four satellites, the receiver can

---

http://unstats.un.org/unsd/publication/SeriesF/SeriesF_79E.pdf (originally cited at A897, n. 3).

[11] A74 at col. 1, ll. 23–28.

[12] A75 at col. 3, ll. 18–25.

[13] "Current GPS Constellation," U.S. Naval Observatory (last visited Oct. 9, 2014), *available at* http://tycho.usno.navy.mil/gpscurr.html (originally cited at A898, n. 6).

compute its position on earth (identified by latitude, longitude, altitude) based on how long each message took to travel from the satellite to the receiver.[14]



**Figure 1**

The '836 patent describes two preferred embodiments of the claimed method for generating and storing data in a traveling mobile unit. The first preferred embodiment is set forth in method Claim 1 and described in the Brief Summary of the Invention:

> "It is an object of the invention to establish a method to generate appropriate data utilizable for a practical destination tracking system which carries out a permanent self updating and with data generation which requires little effort. This method is also appropriate for deriving destination tracking data from the data generated in accordance with the aforesaid method."[15]

In other words, Claim 1 describes the generation of travel data that can be used for destination tracking and storage of specific information relating to that

---

[14] *See* "How GPS Works," Nat'l Coordination Office for Space-Based Positioning, Navigation, and Timing (Feb. 2013), (last visited Oct. 9, 2014), *available at* http://www.gps.gov/multimedia/poster/ (originally cited at A898, n. 7).

[15] A75 at col. 3, ll. 38–45.

travel on the mobile unit, and it is continuously updated as the unit continues its trip.[16] Other dependent claims, like Claim 11, add a step that includes transmission of stored data files from the mobile units to at least one remote central computer that merges the data files into an overall route file,[17] which can be used to provide more accurate and complete road networks to the mobile units and historical traffic information that can be used to predict future traffic flow, with surprising accuracy, along the same roads.

### B.    The Patent Terms at Issue

The claim limitations at issue in this appeal are:

(1)    "node";

(2)    the preamble of Claim 1, which includes two separate limitations the District Court construed;

    (a)    "generating and updating data for use in…";

    (b)    "destination tracking system of at least one mobile unit"; and

(3)    "storing … data in the storage device."

Each of these terms can be found in Claim 1 of the '836 patent, which describes a method for collecting travel data while a mobile unit (*e.g.*, a personal navigation device or PND) travels within a geographic area. Initially, traveled

---

[16] A82 at col. 17, ll. 35-55.

[17] A82 at col. 18, ll. 35-41.

distance data are collected in the mobile unit by a GPS receiver at predetermined time intervals, and then stored as a series of raw geographic location points.[18] The traveled distance data are then converted into section data by selecting from the traveled distance data certain starting and ending points that define contiguous sections of travel. Finally, the section data are stored in a section data file, where the section data can be supplemented and/or updated. The body of Claim 1 captures these three core features of the invention and describes with great specificity the characteristics of the travel information generated and stored in each step.[19]

> 1. *A method for **generating and updating data for use in** a **destination tracking system of at least one mobile unit** comprising*:
>
> generating and ***storing traveled distance data in at least one storage device*** provided in said mobile unit at least at predetermined time intervals, wherein the traveled distance data represent traveled sections by at least a series of ***nodes*** $P_i$ and to each ***node*** $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned;
>
> generating and ***storing section data in the storage device*** provided in the mobile unit, said section data being generated by selecting, from the traveled distance data, ***nodes*** $P_j$ and $P_k$, which define contiguous sections $P_j P_k$, to

---

[18] *See* A78 at col. 9, ll. 45-62; A82 at col. 17, ll. 38-44.

[19] The terms for which Adolph seeks construction or a determination that construction is not necessary and the plain meaning controls are **boldfaced,** ***italicized*** and ***colorized*** for convenience of identification.

which at least their geographical starting point and end point are assigned; and

generating a section data file from the section data and ***storing the section data file in the storage device*** provided in the mobile unit said section data file being continuously supplemented and/or updated with section data newly generated by the mobile unit.[20]

The first step of the claimed method involves generating and storing "traveled distance data." As illustrated in Figure 2 below, Claim 1 describes "traveled distance data" as data having at least a series of nodes. As the mobile unit travels, it determines its location on the globe at predetermined time intervals, such as every second, and generates and stores that data measured at each node. The $x$ and $y$ coordinates recorded for that location are acquired using GPS and are assigned to a node.[21] Latitude and longitude are an example of commonly used geographic coordinates.[22]

---

[20] A82 at col. 17, ll. 34-55.

[21] *E.g.*, A75 col. 3, l. 66; A76, col. 5, ll. 17–23; A76, col. 5, ll. 51–55; A78, col. 9, ll. 51–54.

[22] Nat'l Wildfire Coordinating Group, "Geographic Location Systems," Basic Land Navigation at 3.2 (June 2007), *available at* http://www.nwcg.gov/pms/pubs/large.html#land.



**Figure 2**

The second step of Claim 1 involves generating and storing "section data." As illustrated in Figure 3 below, this claim characterizes "section data" as being generated from "traveled distance data" by selecting nodes that form the end points of a section (*i.e.*, a contiguous segment of road). As the specification explains, a section may include more than two nodes.[23] So, in Figure 3, for example, $P_1P_2$ and $P_2P_5$ are examples of sections or "section data."



**Figure 3**

Claim 1 requires that nodes be selected to form "section data" in a manner that means each section represents a contiguous section of travel. If the GPS signal

---

[23] A104 at col. 10, ll. 25–29.

is lost, several "bad" traveled distance data points would be generated that are not accurate GPS readings. That data should not be used, because it is inaccurate, which means that less than all of the traveled distance data would be "selected" to generate and store "section data." In these situations, or if a user turns off the device, for example, there would be a gap in the section data, in the sense that an entire route from start to destination might not be recorded. Figure 4 illustrates this not-uncommon situation:



**Figure 4**

In this example, the two contiguous sections that constitute "section data" are $P_1P_2$ and $P_4P_5$.

The third step of method Claim 1 involves generating, storing, and updating a "section data file." To write data to a file, data must be converted to some binary format.[24] Figure 5 illustrates this step:



**Figure 5**

Additionally, in Claim 1, the section data file is continuously supplemented and/or updated with new section data, as the mobile unit continues to travel and generates new section data from traveled distance data.

Claim 1 does not specify any particular storage medium used for practicing the multi-step method besides a "storage device." As was well understood at the time the '836 patent was filed, a "storage device" is "[a] device used for storing

---

[24] A657-659.

data within a computer, such as a hard disk, floppy disk, magnetic tape, and RAM."[25]

Claim 1 does not describe a method for navigating, or a method for avoiding traffic, or even a method for making digital maps. Rather, Claim 1 describes a method for generating, updating, and storing particular types of data with specific characteristics using a mobile unit. The collected data will end up being used to generate navigation instructions at some point later. But the return of the data for use in the mobile units is explicitly covered by other claims, such as Claims 17-20. Finally, the only claim language involving a "destination tracking system" is found in the preamble of Claim 1, and not in the other 52 claims.

### C.    Prosecution History

The '836 patent's prosecution history is short and focused.[26] During prosecution, the Examiner conducted numerous art searches, considered the preliminary search report from the PCT application, and reviewed all of the references disclosed to the Examiner during prosecution. Given the state of travel data collection and navigation technology in 1997, the U.S. Patent and Trademark Office did not find or cite a significant body of art against Dr. Adolph's claimed

---

[25] A666. The same source defines "computer" generally as "a device capable of solving problems or manipulating data which would include the "mobile unit" of Claim 1. *See* A665.

[26] The '836 patent relies on a priority German patent application filed on June 12, 1997.

invention. It primarily focused on a comparison of two references and the pending claims—the Saito reference and the Thad reference.[27]

With respect to the appealed claim construction for the term "node," the prosecution history does not impact its meaning; the term "node" was not limited during prosecution or used to overcome the Examiner's rejections.[28] Additionally, the Examiner did not raise the appealed "storage devices" limitations of Claim 1 when comparing this claim to the cited art. Nor were these limitations a basis for distinguishing that art from the invention recited in Claim 1.[29]

There is, however, significant prosecution history that relates to the question of whether the preamble of Claim 1 should be treated as a limitation. Importantly, the Examiner reviewing the '836 patent claims never treated the preamble of Claim 1 as a limitation when comparing it to the teachings of Saito and other references.[30] Instead, the Examiner focused on the body of Claim 1—which follows the "comprising" language in the preamble—in one Examiner interview, two Office Actions, and one Examiner statement of the Reasons for Allowance.[31] Dr. Adolph's responses also focus on the three "generating and storing" limitations in

---

[27] U.S. Patent No. 4,982,332; WO 92/02891.

[28] *See* A171-A269.

[29] *See* A171-A269.

[30] A172-73.

[31] A171-269.

the body of this claim, and he successfully overcame the Examiner's rejections without reference to the preamble.[32]

The Examiner's first Office Action suggested a revision to Claim 1 to provide clarity regarding the method claimed.[33] The Examiner noted that the transition between the preamble and the steps in the body of the claim "is not clearly shown and understood," and suggested that the punctuation be reviewed and the claim be re-written.[34] This suggestion evidences the Examiner's understanding that the preamble and body of Claim 1 should be treated differently and clearly separated.

The Examiner also rejected certain pending claims, including Claim 1, under 35 U.S.C. § 102(b), asserting that they are anticipated by Saito (U.S. Patent No. 4,982,332).[35] The Examiner characterized the Saito method as one that meets the three steps *in the body* of Claim 1 by (1) generating and storing traveled distance data in at least one storage device, (2) generating the section data by selecting from the traveled distance data contiguous sections, and (3) generating a section data file from the section data stored in the mobile unit and continuously supplementing and/or updating it with newly generated section data and did not discuss the

---

[32] A201-269.

[33] A187-89.

[34] A190.

[35] A191-92.

preamble of Claim 1 when comparing the Saito disclosure to the pending claim.[36] The Examiner also identified an antecedent basis issue that needed to be resolved for Claims 1 and 22.[37]

In response, Claims 1 and 22 were amended to conform to the format the Examiner suggested and to eliminate issues involving the lack of antecedent basis for the terms "sections," (Claim 1) and "the absolute coordinates" (Claim 22).[38]

When responding to the anticipation rejection, Dr. Adolph compared Claim 1 to and distinguished it from Saito on three basic grounds. First, "Saito *requires* that an initial database representing road data or road ways be loaded into the system before the additional acquisition of data can take place" and requires the step of "'previously expressing each point on the roads in a map.'"[39] Noting that Saito also teaches a method that requires a CD-ROM, IC card, or another storage device having a large capacity, Saito and similar systems "*require*, for their operation, the initial input of road data collected and generated by some external means."[40] In contrast, the invention claimed in the '836 patent allows even a single mobile unit to start generating and storing data "without *the need for any initial*

---

[36] *Id*.

[37] A193.

[38] A196-197.

[39] A198 (emphasis added).

[40] *Id*. (emphasis added).

*information* relating to existing road networks."[41] This allows the mobile unit of the '836 patent to "generate a complete road map with selected relevant information representing all of the sections traveled by the mobile unit over time," and "this can all be accomplished without the need for any initial network data."[42]

Dr. Adolph's distinction was this: while initial road map information was required for the method disclosed in Saito to work, it is optional in the '836 patent, which can practice the claimed data acquisition and storage method either with or without an initial map or route file. Indeed, Claim 1 does not contain a limitation relating to an initial map or route file; it focuses on collecting and storing new travel data in the mobile unit in a manner that preserves information relating to the unit's geographic location at predetermined time intervals.

Second, Dr. Adolph noted that Saito only updates the road network contained in the CD-ROM or other media if the new section of road that has been traveled by the vehicle is within the road network already covered by that storage device.[43] Again, since the '836 patent "does *not require* the existence of prior road

---

[41] *Id*. (emphasis added).

[42] *Id*.

[43] *Id*.

data bank to process and store information relating to new points and sections," Dr. Adolph argued that it is distinguishable.[44]

Third, Saito only stores data relating to the physical location of nodes, segments, or roads connecting the nodes.[45] In contrast, the '836 patent generates and stores section data that includes other relevant information (e.g., the time of day that a particular section is traveled).[46]

In response, in April 2001, the Examiner issued a second Office Action. The Examiner repeated prior arguments that Saito practices all three steps of Claim 1.[47] Again, the Examiner did not treat the preamble as a limitation when discussing Claim 1 and comparing it to the teachings of the Saito reference.[48] The Examiner added another anticipation rejection under 35 U.S.C. § 102(e) using the Thad reference. The Examiner compared Thad to the three steps recited in the body of method Claim 1 and ignored the preamble of the claim.[49]

A few months later, the Examiner and prosecuting attorney conducted an interview. Following this interview, Dr. Adolph's representative submitted an additional response, which discussed some of the distinctions between Claim 1,

---

[44] *Id.*

[45] A199.

[46] *Id.*

[47] A183-84.

[48] A172-73.

[49] A175-176.

Saito, and Thad. One of the distinctions Dr. Adolph identified is that while the storage medium in Saito that contains the initial map cannot be updated, the section data file of the invention can be updated as new section data is acquired and saved.[50]

After receiving this response, the Examiner allowed claims 1-53 of the '836 patent, and in the adjoining Reasons for Allowance, stated that the Saito and Thad references do not "either singularly or in combination, teach or fairly suggest" the three steps present in the body of method Claim 1.[51] The '836 patent issued on March 12, 2002.

## II.    TomTom Files An Offensive Suit Against Dr. Adolph

In 2011, Dr. Adolph determined that TomTom's mobile units were collecting, storing, and using travel information in the manner taught by his German patent. So his small German company, AOT,[52] brought suit against a German distributor of TomTom's devices in the German infringement courts in 2012.[53] TomTom, Inc. responded by filing this lawsuit against AOT in the U.S.

---

[50] A178.

[51] A267-68.

[52] The name AOT stands for "Always On Time," and was created to test and commercialize the technology found in the '836 patent.

[53] A116-17.

District Court for the Eastern District of Virginia, several months later.[54] TomTom, Inc. sought a declaration that the '836 patent is either invalid or not infringed by TomTom's PNDs and its software that tracks and stores travel information on the mobile units.[55]

TomTom later added Dr. Adolph as a defendant in the lawsuit, and the District Court dismissed AOT because it did not hold any rights to the '836 patent.[56] TomTom International BV and TomTom North America, Inc. became counterclaim defendants because of their involvement in the development of TomTom's software and sale of its PND's and maps across the U.S., since 2006.[57]

In January of 2013, near the end of discovery, the trial court held a Pretrial Conference in which TomTom sought leave to file more than one summary judgment brief. TomTom asserted that the entire case could be disposed of on the basis of legal issues relating to practice of the claimed invention outside of the U.S. The District Court granted this request, and TomTom filed its first motion for summary judgment soon thereafter.[58] In that motion, TomTom alleged that it does not infringe the '836 patent because certain travel data merging activities it

---

[54] A41.

[55] A88-89.

[56] A85; A42.

[57] A155-158.

[58] A802.

asserted are covered by independent Claim 1 occur on servers in The Netherlands.[59] Dr. Adolph responded, stating that TomTom imported new limitations relating to data-merging activities into Claim 1, conflated Claim 1 and dependent Claim 11 (which contains a data merging step on remote central computers), and provided record evidence that the steps found in method Claim 1 are practiced wholly in the U.S. At the end of the hearing, the trial court denied TomTom's first summary judgment motion from the bench.[60]

The parties then filed claim construction briefs, with TomTom filing the opening brief per the parties' agreement, and Dr. Adolph responding. TomTom argued that 8 terms or limitations in Claim 1 and one limitation in Claim 22 must be construed.[61] Dr. Adolph responded that Claims 1 and 22 did not require "construction" given their detailed nature; rather, the District Court should determine the plain meaning of the terms TomTom sought to be construed.[62] The

---

[59] A809; A817-20.

[60] A826-27; A890.

[61] A865-67.

[62] A895-96; A918. On at least one occasion, the District Court stated that Dr. Adolph believed the claim terms should be given their plain and ordinary meaning and that this is an unusual situation. *See, e.g.*, A291. But as this Court has held, the words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when

District Court held a second hearing relating to claim construction in March 2013 and issued its claim construction ruling over 11 months later.[63] The court adopted the plain meaning for 2 of the terms and construed the others.[64] In its claim construction opinion, the District Court concluded that two separate elements found in the preamble of Claim 1 are substantive aspects of the claim and construed them separately.[65] Generally, the District Court issued constructions that imported limitations from the specification into the claims and limited certain aspects of Claim 1 (and the claims that depend from it) to the disclosed embodiments only.[66]

Before the parties had discussed and submitted a proposed schedule for the rest of the case, TomTom filed a second motion for summary judgment of noninfringement.[67] In this new motion, TomTom asserted that Dr. Adolph could not provide factual evidence to demonstrate that its devices practiced the activities

the patentee disavows the full scope of a claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996)). Dr. Adolph took the position before the District Court that the plain meaning should be applied to all 9 terms TomTom sought to have the District Court construe.

[63] A59; A61.

[64] A28-29.

[65] A16-17.

[66] A11-27.

[67] A61; A953.

in 4 of the construed claim terms.[68] TomTom also argued that a noninfringement decision by the trial court in Germany involving AOT and German distributor of TomTom's devices should be given collateral estoppel effect in the U.S. case between TomTom and Dr. Adolph.[69]

Dr. Adolph responded by filing a motion for reconsideration of one of the trial court's constructions and a detailed response to TomTom's second summary judgment motion.[70] The District Court denied Dr. Adolph's motion for reconsideration, and the parties agreed to a joint stipulation and judgment of noninfringement based on that court's construction of the term "destination tracking system" and dismissal of all claims in order to allow the claim construction ruling to be appealed.[71] In that stipulation, TomTom and Dr. Adolph agreed that the court's construction of (1) the remainder of the preamble, (2) a portion of the first step of method Claim 1, and (3) storage devices actually affect the outcome of the case.[72] The District Court entered judgment of noninfringement based on this stipulation, and this appeal followed.[73]

---

[68] A959-960; A965-970.

[69] A959-960 n3.

[70] A61; A994-994; A995-1028.

[71] A64; A1101-08.

[72] *Id.*

[73] A65; A32-34

# SUMMARY OF THE ARGUMENT

The District Court committed several errors in construing the claims:

1.    The District Court erred by construing "node" to be a "point at which the vehicle changes direction by more than a predetermined value in a grid or road network." This construction ignores the explicit language of Claim 1, which requires nodes to be generated and stored at least at predetermined *time intervals*.

2.    The District Court erred by converting a preamble statement of purpose into a new claim limitation based on the resolution of an antecedent basis problem in an unrelated portion of the preamble.

3.    The District Court erred by construing the preamble statement of purpose to mean "the data generated and updated by the mobile unit *is used by that unit*." This interpretation failed to resolve the parties' dispute as to whether the mobile unit can use the data it generates, even when the data is first sent to an external computer and then returned.

4.    The District Court erred by construing "destination tracking system of at least one mobile unit" as a system that "does not *contain*" an initial map database, based solely on the inventor's statement during prosecution that the system does not *require* an initial map database.

5.    The District Court erred by requiring each type of data identified in Claim 1 to be stored in a *different* storage device, when Claim 1 specifically states that each type of data are stored in "*the* [at least one] storage device."

## STANDARD OF REVIEW

Claim construction presents questions of law subject to plenary *de novo* review.[74] A stipulated final judgment is reviewed under the law of the relevant regional circuit.[75] The Fourth Circuit reviews conclusions of law, including final judgments, *de novo*, and reviews factual findings for clear error.[76]

If any claim construction is altered upon appellate review, the final order of judgment should be vacated and the case should be remanded to the District Court to resolve any new factual issues raised by the new claim construction.[77]

---

[74] *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276–77 (Fed. Cir. 2014) (en banc) .

[75] *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1325-26 (Fed. Cir. 2006) (applying Seventh Circuit law to review a stipulated judgment).

[76] *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014); *Mort Ranta v. Gorman*, 721 F.3d 241, 250 (4th Cir. 2013); *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010); *United Rentals, Inc. v. Angell*, 592 F.3d 525, 531 (4th Cir. 2010); *In re Runski*, 102 F.3d 744, 745 (4th Cir. 1996); *Butler v. David Shaw, Inc.*, 72 F.3d 437, 441 (4th Cir.1996).

[77] *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 834 (Fed. Cir. 2003); *see also Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1371 (Fed. Cir. 2005) (requiring the district court to "reexamine the infringement question" after ordering changes to the claim construction).

# ARGUMENT

## I.    *Nodes* Can Be Recorded at Least at Predetermined Time Intervals

Dr. Adoph's invention solved the problem of updating map and travel information quickly and efficiently by enabling mobile units to collect and save new travel data as the mobile units move through a roadway network. The invention collects travel data in at least two different situations: (1) at predetermined time intervals, and (2) after a vehicle has covered a certain distance.[78] Each of these collection techniques is important, but Claim 1 specifically requires travel data, in the form of *nodes,* to be collected "at least at predetermined time intervals."[79] When data is collected at predetermined time intervals or after a vehicle has covered a certain distance, it is possible to discover new roads that are not yet in the existing map database.[80] It is also possible to discover traffic delay patterns, which enable navigation systems to anticipate future traffic congestion and forecast more efficient routes to a given destination.[81]

---

[78] A78 col. 9, ll. 51-58.

[79] A82 col. 17, ll. 38-44.

[80] A82 col. 17, ll. 17-24 ("In contrast to known destination tracking methods or systems, the method or system according to the invention ***continuously revises data with respect to the traversable network sections*** as well as realized and realizable trip times or times of motion, to calculate minimal time routes between two ***arbitrary nodes***. This is achieved by merging ***new*** data on links and traffic conditions that model reality into the system's storage units." (emphasis added)).

[81] *Id.*

The District Court construed the term "node" to mean "an intersection, origin, destination, or point at which the vehicle changes direction by more than a given predetermined value in a grid or road network."[82] Surprisingly, the District Court's construction of *node* not only excludes the collection of travel data at predetermined time intervals, but it is wholly inconsistent with that basic requirement of Dr. Adolph's invention. Rather than permit a mobile unit to gather data wherever it goes, the District Court's construction ignores the explicit language of Claim 1 (which collects traveled distance data at predetermined time intervals) and improperly limits the collection of travel data to an "intersection, origin, destination, or point at which the vehicle changes direction by more than a predetermined value in a grid or road network."

This construction eviscerates one of the primary purposes and embodiments of the invention, which is to create *new* digital travel data. If the District Court's construction is permitted to stand, then Dr. Adolph's invention will be limited to recording points that are already known (*i.e.*, intersections, origins, and destinations) or that already exist in a known grid or road network. In either case, Dr. Adolph's invention will be rendered useless for one of the objects of the invention because the claims, as construed, will not cover the collection of new data.

[82] A12.

For similar reasons, if the District Court's construction is upheld, the claims will also fail to cover the collection of *traffic* data on existing roads. A key attribute of traffic data is the distance traveled during a given period of time. Without the ability to record travel data at predetermined time intervals or after a vehicle has covered a certain distance, the claims would not cover systems that can predict future traffic delays based on historical travel data that associates times with distance traveled. The claims will only cover systems that record nothing more than already-known locations. Such an interpretation flies in the face of the claim language, the specification, and the prosecution history, which together describe a system that records newly discovered road location data as well as traffic information found in travel times.

### A.    Claim 1 Requires *Node* Data to be Collected at Least at Predetermined Time Intervals

Claim 1 requires node data to be collected at least a predetermined time intervals. This understanding flows directly from the following syllogism: (1) the first step of Claim 1 creates traveled distance data; (2) traveled distance data comprise a series of *nodes* $P_i$; and (3) traveled distance data must be "generated and stored ... *at least at predetermined time intervals*."[83] These facts lead directly

---

[83] A82 col. 17, ll. 35-44 (first portion of Claim 1).

to the conclusion that *node* data must be collected at least at predetermined time intervals.

The syllogism can be found in the first few phrases of Claim 1:

> **1**. A method for generating and updating data for use in a destination tracking system of at least one mobile unit comprising:
>
> ***generating and storing traveled distance data*** in at least one storage device provided in said mobile unit ***at least at predetermined time intervals***,
>
> wherein the ***traveled distance data*** represent traveled sections by at least a series of ***nodes*** $P_i$ and to each ***node*** $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned;[84]

Nothing in Claim 1 contradicts the syllogism or refutes the inescapable conclusions that Claim 1 requires traveled distance data to be collected at least at predetermined time intervals and that traveled distance data includes *nodes*. Node data must therefore be collected at least at predetermined time intervals.

## B.    The Specification Supports the Collection of *Node* Data at Predetermined Time Intervals

The '836 patent specification devotes approximately 30 lines of text to explain how traveled distance data can be created.[85] As explained there, when a mobile unit equipped with Dr. Adolph's invention is turned on, three different

---

[84] *Id.*

[85] A78 col. 9, l. 45 to col. 10, l. 7.

component devices begin generating signals.[86] First, a GPS receiver sends a signal identifying the location of the vehicle.[87] Then a compass issues a direction signal $\alpha$.[88] And finally, a clock generates a time signal $t$.[89] These three signals are combined in a trip storage unit to create the first entry of ***traveled distance data*** $P_i$ comprising geographical coordinates $x_i$, $y_i$ of the starting point $P_i$ and the absolute time $T_i$.[90] "The subsequent points $P_{i+1}$, ..., $P_{i+n}$ are stored in the same manner according to a prescribed routine, for example, **after a given time interval** given by the clock ..., or **after a certain distance has been covered** as given by a mileometer ...."[91] It can hardly be any clearer that the specification describes collecting traveled distance data at least at predetermined time intervals.

Importantly, the '836 patent describes no other procedure to create traveled distance data.[92] Therefore, because traveled distance data must include node data

---

[86] A78 col. 9, ll. 46-51.

[87] A78 col. 9, ll. 45-49.

[88] A78 col. 9, l. 50. The "$\alpha$" symbol is missing from the Adolph patent (there is a noticeable gap in its place), but the "$\alpha$" symbol is present in the corresponding EP version. *See* EP 0 988 508 B1, ¶ 70, col. 13, ll. 49.

[89] A78 col. 9, ll. 50-51.

[90] A78 col. 9, ll. 51-54 (emphasis added).

[91] A78 col. 9, ll. 54-58 (emphasis added). The term "mileometer" is a British word equivalent to the American and Canadian word, "odometer."

[92] Other parts of the '836 patent discuss the composition of traveled distance data (A75 col. 3, l. 66 to col. 4, l. 5), the fact that generation of traveled distance data

(this is true, at the very least, according to Claim 1), the specification of the '836 patent fully supports the collection of node data at predetermined time intervals.

### C.    *Node* Data Is Equivalent to *Point* Data for Claim 1

It must be acknowledged that within the specification, the term "node" is used primarily in the context of selecting, storing, and using *section data*, not traveled distance data.[93] Conversely, when the specification of the '836 patent discusses traveled distance data, it uses the term "point" instead.[94] But for both "point" and "node," the specification consistently uses the same mathematical notation $P_i$, including traditional coordinate notation $x_i$, $y_i$.[95] In addition, the specification frequently uses the terms "point" and "node" interchangeably, to refer to the exact same data.[96]

Putting aside the various uses of "point" and "node" in the specification, the use of "node" in the context of Claim 1 controls its meaning.[97] Claim 1 uses the

---

can be interrupted and restarted (A75 col. 4, ll. 6-13), and other data that can be included as part of the traveled distance data (A76 col. 6, ll. 51-58).

[93] *See, e.g.*, A78 col. 10, ll. 8-29.

[94] *See, e.g.*, A78 col. 9, ll. 45-62.

[95] *See, e.g.*, A78, col. 10, ll. 8-29.

[96] *See, e.g.*, A77 col. 7, ll. 61-65 (using the term "nodes" in the brief description of FIG. 3 and then using the term "points" in the brief description of FIG. 4 *for the exact same figure elements*); *see also*, A78 col. 10, ll. 13-19 (referring to $P_i$ and $P_k$, first as "points" and then as "nodes").

[97] *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves ... to define the scope of the

term "node," not only in the context of creating section data from traveled distance data, but also in the context of *creating the initial traveled distance data.* Consistent with the disclosure found in the specification, Claim 1 states that traveled distance data will be generated at least at *predetermined time intervals* and that traveled distance data represents traveled sections by at least a series of *nodes* $P_i$. This use of "node" in the broader context of generating both traveled distance data and section data confirms the patentee's intent to treat "points" and "nodes" as equivalent concepts for the purpose of the patent, including Claim 1.

### D.  A *Node* is a Geographic Location

Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history.[98] "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee

---

patented invention"); *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004) ("[g]enerally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction'").

[98] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

disavows the full scope of the claim term either in the specification or during prosecution."[99]

The '836 patent does not explicitly define the term "node," which means Dr. Adolph did not act as his own lexicographer with respect to this term. Nor does the '836 patent disavow any meaning of "node." Instead, the '836 patent simply uses the term "node" in context with other concepts. That said, whenever "node" appears in the patent, and especially in the claims, the mathematical expression "$P_i$" often follows immediately.[100] And whenever the mathematical expression "$P_i$" appears in the patent, the additional explanatory phrase, "comprising [or containing] geographical coordinates $x_i$ and $y_i$" is often present.[101]

These phrases together create a compelling impression that a node is nothing more than a geographic location associated with a point $P_i$, having geographical coordinates $x_i$ and $y_i$. Claim 1 reinforces this understanding, stating, "to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned."[102] With all this explanatory information in both the specification and Claim 1, the plain and ordinary meaning

---

[99] *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. June 27, 2014) (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

[100] *See, e.g.*, A78 col. 10, ll. 14-29; A82 col. 17, ll. 43-44.

[101] *See, eg.*, A75 col. 3, ll. 66-4:5; A76 col. 5, ll. 51-55; A78 col. 9, ll. 51-54; A78 col. 10, ll. 22-26.

[102] A82 col. 17, ll. 43-44.

of the term "node" must be "geographic location." This interpretation is consistent with the specification, which associates nodes with all sorts of geographical locations: origins and destinations,[103] as well as intersections[104] and even arbitrary locations.[105] Nodes are additionally associated with the points that are generated and stored during the creation of traveled distance data.[106] There is no need or basis under this Court's claim construction jurisprudence to add any restrictive limitations to the definition of "node." A node is simply a geographic location.

###    E.    The District Court's Construction of *Node* Must Be Corrected

Dr. Adolph's invention cannot achieve its full purpose unless new travel data are collected either at predetermined time intervals or after a certain distance has been covered. That is, the data must be collected while a mobile unit moves on any road, at any time, without regard for whether any newly collected geographic locations are located within an existing grid or road network. Indeed, an important purpose of the invention is to obtain new and more accurate road and travel information.[107] The District Court's construction, which limits the collection of

---

[103] A77 col. 7, ll. 41-44.

[104] A77 col. 7, ll. 61-65 ("nodes," and alternately "points" represent road intersections), *see also* FIGS. 3-10.

[105] A82 col. 17, ll. 17-24.

[106] A78 col. 9, ll. 51-58.

[107] *See, e.g.*, A67; A75 col. 3, ll. 38-45 ("It is an object of the invention to establish a method to generate appropriate data utilizable for a practical destination tracking

data to only locations that are previously known or are within a known grid or road network, excludes primary embodiment and renders the claimed invention inoperable.

> **District Court's Construction**: "[an] intersection, origin, destination, or point at which the vehicle changes direction by more than a predetermined value in a grid or road network."[108]

> **Adolph's First Proposed Construction**: "<u>a geographic location</u>."

> **Adolph's Second Proposed Construction**: "<u>a geographic location, which is associated with an</u> intersection, origin, destination, or point at which the vehicle changes direction by more than a predetermined value ~~in a grid or road network~~, <u>or which is obtained at a predetermined time interval, or after a certain distance has been covered</u>."

Dr. Adolph offers this Court two appropriate constructions for the term "node" that are both consistent with its plain meaning. The first one is "a geographic location." It is a simple, easy to understand definition that reinforces the plain meaning of the term and is consistent with the language of the claims and the specification.

When the District Court considered a minor variation of Dr. Adolph's proposed construction ("a location reading"), the court held that it was too broad

---

system which carries out a permanent self updating and with data generation which requires little effort. The method is also appropriate for deriving destination tracking data from the data generated in accordance with the aforesaid method").

[108] A12; A30.

because the specification "restricts nodes to certain types of locations," namely intersections, origins, destinations, and locations where the vehicle changes direction by more than a predetermined amount.[109] As Dr. Adolph has explained above, however, this observation is wrong. Nodes are created whenever and wherever traveled distance data can be created, which is essentially anywhere the mobile unit can go.[110] The plain and ordinary meaning of "node" is appropriate here. Nodes are simply geographic locations.

As an alternative to a plain meaning definition, Dr. Adolph proposes a series of edits to correct the District Court's errors and bring the construed definition in line with the requirements of Claim 1 and the overall teachings of the patent. Dr. Adolph's edits not only clarify that a node is a geographic location, but delete the portion of the District Court's construction that limited the creation of nodes to particular nodes that lie in existing grids or road networks. Dr. Adolph also adds new language to explain that nodes can be created, not only at a point at which the

---

[109] A12.

[110] A82 col. 17, ll. 17-24. ("In contrast to known destination tracking methods or systems, the method or system according to the invention *continuously revises data with respect to the traversable network sections* as well as realized and realizable trip times or times of motion, to calculate minimal time routes between two ***arbitrary nodes***. This is achieved by merging *new* data on links and traffic conditions that model reality into the system's storage units.") (emphasis added).

vehicle changes direction by more than a predetermined value, but also at a predetermined time interval, or after a certain distance has been covered.

## II.    Using One Part of a Preamble to Provide Antecedent Basis Cannot Alone Justify Converting Other Unrelated Parts of the Preamble Into New Claim Limitations

The preamble of Claim 1 recites "[a] method for generating and updating data for use in a destination tracking system of at least one mobile unit comprising…." This is classic "purpose or intended use" language. It follows a typical pattern that is found in thousands of claims using well-established U.S. claim drafting practices. The pattern is: "a method for [a purpose or intended use] comprising," followed by the body of the claim, where the actual limitations describing the invention are recited. It is well understood that when a preamble follows this pattern, the language stating the purpose or intended use of the

invention should not be used to limit a claim's scope.[111] This rule is especially true when the body of a claim "sets out the complete invention."[112]

There are some exceptions, however, that are not applicable here. If a preamble "recites essential structure or steps," or if the preamble is "necessary to give life, meaning, and vitality" to the claim, then at least portions of the preamble can limit the scope of a claim.[113] One way a preamble can give meaning to a claim is to provide antecedent basis for a limitation that is used in the body of the claim.[114] In these situations, the portion of the preamble providing antecedent basis may act as a necessary component of the claimed invention and therefore may be subject to claim construction.[115]

---

[111] *See e.g., Biocon, Inc. v. Struamann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) ("Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim."); *STX LLC. v. Brine*, 211 F.3d 588, 591 (Fed. Cir. 2000) (holding that preamble phrase "which provides improved playing and handling characteristics" in claim drawn to a head for a lacrosse stick is not limiting); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (concluding that a preamble which merely states the purpose or intended use of the invention, rather than any distinct definition of any of the claimed invention's limitations, is not a limitation of the claim).

[112] *Biocon, Inc. v. Struamann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (citing *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002)).

[113] *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

[114] *Id.*; *see also Biocon,* 441 F.3d at 952-53.

[115] *Biocon,* 441 F.3d at 952.

The question before the Court now is whether reliance on one portion of a preamble to resolve an antecedent basis concern automatically converts other unrelated portions of the preamble into new claim substantive limitations.

The District Court said that it does. With respect to Claim 1, the District Court ruled that because the phrase "at least one mobile unit" provides antecedent basis for the later use of the terms "said mobile unit" and "the mobile unit" in the body of the claim, *the entire preamble must be construed*.[116] The District Court reached this result without separately determining whether the unrelated parts of the preamble recite essential structure or steps, or are necessary to give life, meaning, and vitality to the claim. The District Court simply concluded, "Thus, because Claim 1 relies on its preamble for antecedent basis [of the mobile unit], the [other, unrelated] disputed claim terms in the preamble must be construed."[117]

Dr. Adolph respectfully disagrees. The fact that one phrase recited in a preamble is determined to be a limitation by virtue of providing antecedent basis for a later reference should not convert the entire preamble into a limitation, particularly unrelated terms that only state the purpose and/or intended use of the invention. With respect to the '836 patent, the term "generating and updating data

---

[116] A15-17 ("Here, the preamble must be construed because part of the claim relies on the preamble for antecedent basis.").

[117] A17; A31.

for use in," which appears in the preamble of Claim 1, is a statement of intended use. It does not appear in the body of any asserted claim.

Moreover, the invention claimed in the '836 patent is structurally complete without this term. As discussed earlier, Claim 1 is directed to a three-step method for generating and storing travel-related data. Claim 1 does not require the data to be used later. It only requires the data to be generated, selected, stored, and continuously supplemented or updated. All of these steps are performed within the body of Claim 1. Granted, there is little doubt that the data collected could eventually be used in the context of a navigation system. But this is not a limitation of Claim 1, and reciting that particular statement of purpose in the preamble of Claim 1 does not automatically convert it into a claim limitation.[118] The phrase "generating and updating data for use in" does not recite essential structure or steps, or give necessary life, meaning, and vitality to a claim. It was legal error for the District Court to use antecedent basis to justify converting this independent part of the preamble into a new claim limitation.

---

[118] *See e.g., Biocon*, 441 F.3d at 952 ("Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim.").

### III. A Mobile Unit Can Use the Data It Generates, Even When the Data Is First Sent to an External Computer and Then Returned

Once the District Court construed "generating and updating data for use in" to mean "the data generated and updated by the mobile unit *is used by that unit*,"[119] the parties immediately disagreed about the construction's meaning. Adolph interpreted the District Court's ruling to mean that a mobile unit can use the data it generates, even when the data is first sent to an external computer and then returned for later use.[120] TomTom disagreed, arguing that that the phrase "is used by that unit" means that the data must be used by the mobile unit without any external processing.[121]

This portion of the Claim 1 preamble should not be considered a separate limitation of Claim 1 and therefore should not be construed at all.[122] If this term must be construed, however, Adolph maintains that the parties' different positions demonstrate that the District Court's construction is the basis for another construction disagreement.

The District Court's construction of the preamble phrase "generating and updating data for use in" is not completely wrong. The data generated and updated

---

[119] A17.

[120] A1011-12.

[121] A966-68.

[122] *See* Argument Section II, *supra*.

by the mobile unit can, in fact, be used by that unit. The only question is whether the phrase "is used by that unit" means that the data can first be sent to an external computer, where it could be merged with other data provided by other mobile units, and then returned to the original unit where the actual usage takes place. The answer is "yes."

The specification of the '836 patent explains that the travel data collected by mobile units can be uploaded to a central computer.

> In order to merge the trips of a large number of vehicles and thus achieve an even more significant and extensive coverage of data, the data saved in the storage units 44, 46, and 48 of the specific control device 2 of the vehicle are transmitted, either automatically after a given period, or on request by entry in the unit 28, by the data input/output device 32 to the central computer 62.[123]

The transmission can occur wirelessly, by cable, or any other way.[124] At the central computer, the data received from different vehicles can be merged together and stored in a section data file residing on the central computer.[125]

At some later time, the central computer can download that data to the same (or other) mobile units. When a driver wishes to make a new trip, for example, the

---

[123] A79 col. 11, ll. 9-16.
[124] A79 col. 11, ll. 16-19.
[125] A79 col. 11, ll. 24-27.

desired origin and destination information is provided to the mobile unit.[126] If the mobile unit does not have all the route information for the requested trip, the mobile unit can ask the central computer either to calculate a route and send it to the mobile unit, or just download all relevant data concerning the area of interest, where the mobile unit can calculate a route by itself.[127]

There is nothing in Claim 1 or the specification of the '836 patent to suggest that data uploaded to a central computer by a mobile unit could not be downloaded to that same mobile unit and used later. Indeed, by virtue of the fact that travel data can be uploaded from all mobile units and merged at the central computer (as described in dependent Claim 11), it is certainly true that a mobile unit could receive data in a download that it provided to the central computer in an earlier upload (*see* dependent Claims 17-20). As described in the specification and set forth in several claims, data generated and updated by a mobile unit can, in fact, be used by that unit: either the data can be collected by a mobile unit and used locally without any external processing, or the data can be collected by the mobile unit, uploaded to a central computer, merged with other data, and then downloaded and used at the mobile unit that first collected it.

---

[126] A79 col. 12, ll. 11-27.

[127] A79 col. 12, ll. 28-36.

## IV.    Destination Tracking System Does Not Require an Initial Map Database

The District Court held that a "destination tracking system of at least one mobile unit" is a system that "does not *contain*" an initial map database.[128] This construction is based entirely on the prosecution history of the '836 patent.[129] But actually, nowhere in the prosecution history does Dr. Adolph assert that the invention described by Claim 1 does not *contain* an initial map database. On the contrary, Dr. Adolph argued that the invention described by Claim 1 does not *require* an initial map database. Although the difference between "contain" and "require" may appear trivial, the impact on the interpretation of the Claim is significant—the District Court's construction reads a preferred embodiment out of the claimed invention through its construction of this term.

When confronted with the Saito reference during prosecution,[130] Dr. Adolph explained that his new invention was different from Saito in several respects. First, Dr. Adolph stated "Saito *requires* that an initial database representing road data or road ways be loaded into the system before the additional acquisition of data can take place."[131] This was true because Saito specifically stated that its invention included the step of "previously expressing each point on the roads in a map in

---

[128] A18-20; A31.

[129] *Id.*

[130] A618-624.

[131] A213 (emphasis added).

numerical form and memorizing them as map data."[132] In making his argument, Dr. Adolph reinforced his "does not *require*" assertion by contrasting his invention with that of Saito's. He said, "[t]he present invention allows even a single mobile unit to commence generating and storing data *without the need for* any initial information relating to existing road networks."[133] Nowhere did Dr. Adolph argue that his invention does not *contain* an initial map database.[134] He simply said that the data collection side of his invention doesn't need one in order for his invention to work, unlike Saito:

> In fact[,] the present invention, even if the systems consist of a single mobile unit, can generate and store data identifying the geographic location of points or nodes, the length and other characteristics of the sections containing nodes, constantly update the data relating to both nodes and sections if changes occur in the road network, and generate a complete road map with selected relevant information representing all of the sections traveled by the mobile unit over time. This can all be accomplished without the need for any initial network data.[135]

Assuming the portion of the preamble of Claim 1 that is not part of the antecedent basis issue should be construed, the District Court went too far when it

---

[132] *Id*.

[133] *Id*. (emphasis added).

[134] It is important to note that Dr. Adolph distinguished the Saito reference on other grounds as well, including the fact that the Adolph invention generates and stores section data, which Saito did not do.

[135] A213 (emphasis added).

held that a "destination tracking system of at least one mobile unit" is a system that "does not *contain*" an initial map database.

## V.    Each Type of Data Can Be Stored in the Same Device

Claim 1 of the '836 patent recites "storing traveled distance data in at least *one storage device*." In two subsequent limitations, Claim 1 additionally recites, "storing section data in *the* storage device" and "storing the section data file in *the* storage device."[136] Yet, the District Court ruled that each type of data identified in Claim 1 must be stored in a *different* storage device.[137]

The District Court's construction of the first term, "storing traveled distance data in at least one storage device," was straightforward. The District Court held that this term should be construed according to its plain and ordinary meaning: "storing traveled distance data in at least one device used for storing data."

When the District Court construed the remaining two storage terms, however, the District Court chose to ignore plain and ordinary meaning and instead focus on an isolated description of one embodiment in order to override the claim language and force each type of data to be stored in a different storage device.[138] This is reversible error. Claim terms are generally given their plain and ordinary

[136] A82 col. 17, ll. 35-55.
[137] A23-28; A31.
[138] A27-28; A31.

meanings to one of skill in the art when read in the context of the specification and prosecution history.[139] "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[140]

Although claims are read in view of the specification of which they are a part, courts are not permitted to read limitations from the embodiments into the claims.[141] And yet, this is exactly what the District Court did.

Claim 1 requires section data to be stored in "*the* storage device." Claim 1 also requires the section data file to be stored in "*the* storage device." "*The* storage device" can only refer to one thing: the "at least one storage device," which also happens to store traveled distance data. There is virtually no other interpretation. Nothing in the claim suggests that section data and the section data file would be stored in any storage device other than "*the* storage device."

The District Court explained that its construction was based on a disclosure in the specification that identified a different storage unit for each type of data:

---

[139] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

[140] *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

[141] *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004).

> As stated above, the patent specification makes clear that (i) traveled distance data is stored in a "trip storage unit or motion storage unit," (ii) section data is stored in a "section data storage unit," and (iii) the section data file is stored in the "section data file storage unit." Thus, the portion of TomTom's construction that clarifies that each type of data is stored in a different storage device is the correct construction.[142]

But the specification also provides a disclosure that shows how each type of data can be stored in the *same* storage device:

> To avoid unnecessary overburdening *the storage device* provided in the mobile unit, additional provisions can be made to permit the generation of *traveled distance data and/or section data* to be interrupted if the newly generated data already exist in *the storage device* of the mobile unit, and to cause said generation to be restarted if the newly generated data have not yet been stored in *the storage device* of the mobile unit.[143]

In addition, the specification also explains that the individual storage units cited by the District Court "are connected by a data bus," thereby at least implying that the storage units can be grouped together. Further supporting this understanding is the fact that the specification also notes that "[t]he construction of these [storage] units is well known and does not need to be further described here." During summary judgment briefing, Dr. Adolph used this statement to argue that software engineers have known for decades that for most applications, including

---

[142] A27 (indirectly referencing A78, col. 9, ll. 21-25).

[143] A75 col. 4, ll. 6-14.

the technologies described in the '836 patent and used in TomTom's mobile devices, a set of different physical storage devices can be equivalent to a single (possibly larger) storage device.[144]

Since at least the early 1970s, application data that is stored in a non-random access memory storage device such as a disk drive is almost always stored as a file. A file is nothing more than a collection of data that is stored as an individual entity in a computing system. A file can be stored on any suitable device; many files can be stored together on the same device; and a computer can use many different storage devices. A software engineer often does not know and does not care which specific device holds a given file. The only requirement is to be able to locate the file, which is easily accomplished using standard naming conventions, such as the file's path name. Unless there is a specific reason why a file must reside on a particular device (for example to obtain certain performance results, which the '836 patent does not mention), a decision to store a file on one particular device versus another device is a design choice. One selection is equivalent to the other.[145]

Taking all these factors into account and focusing specifically on the controlling claim language, the District Court's construction of the terms "storing section data in the storage device" and "storing the section data file in the storage

---

[144] A1021-22.

[145] A1021-22.

device" was not based on a proper understanding of claim construction precedent and was therefore erroneous. These terms should be construed to reflect their plain and ordinary meaning: all three types of data can be stored on the same storage device as described in Claim 1.

## CONCLUSION

For the reasons stated above, this Court should vacate both the District Court's final judgment and the District Court's claim construction order, and remand the case to the District Court for further proceedings consistent with this Court's revised claim constructions.

Dated:  October 10, 2014                    Respectfully submitted,

                                   */s/ Antigone Gabriella Peyton*
                                   Antigone Gabriella Peyton
                                     antigone.peyton@cloudigylaw.com
                                   Clyde E. Findley
                                     clyde.findley@cloudigylaw.com
                                   **CLOUDIGY LAW PLLC**
                                   8300 Greensboro Drive, Suite 1250
                                   McLean, VA 22102
                                   (703) 436-2033

                                   *Counsel for Defendant/Counterclaimant
                                   – Appellant Michael Adolph*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Docket No. | Filing Date | Description | Page No. |
|---|---|---|---|
| 198 | 02/25/2014 | Memorandum Opinion | A1 |
| 199 | 02/25/2014 | Order | A30 |
| 237 | 07/08/2014 | Order awarding Judgment of Non-infringement | A32 |
| 238 | 07/08/2014 | Clerk's Judgment | A35 |
| -- | -- | U.S. Patent 6,356,836 | A67 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| TOMTOM, INC., | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:12cv528** |
| | ) | |
| AOT SYSTEMS GMBH, *et al.*, | ) | |
| **Defendants.** | ) | |

F I L E D

FEB 2 5 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## <u>MEMORANDUM OPINION</u>

This declaratory judgment action is a patent infringement suit. Plaintiff TomTom, Inc. ("TomTom"), the putative infringer of U.S. Patent No. 6,356,836 ("the '836 patent") owned by defendant Michael Adolph, seeks a declaration that the claims of the '836 patent are invalid and that TomTom does not infringe any valid claim of the '836 patent, which purports to cover a method for tracking data in a mobile Global Positioning System ("GPS") unit. Defendant Michael Adolph ("Dr. Adolph") not only opposes TomTom's request for a declaration but also counterclaims that TomTom infringes the '836 patent and seeks damages. As is typical in patent infringement actions, the parties here dispute the meaning of several patent claim terms and phrases, thereby requiring *Markman*[1] claim construction of the disputed terms and phrases. The resolution of these disputes is the subject of this memorandum opinion.

### I.

Plaintiff and counterclaim defendant TomTom is a Massachusetts corporation with its principal place of business in Massachusetts. TomTom sells personal navigation devices ("PNDs") that use software called "HOME." The HOME software gathers historical travel data stored on TomTom devices, including location information, time of travel for certain routes, and

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996) ("The construction of a patent, including terms of art within its claim, is exclusively the province of the court").

A1

historical speed data. TomTom also sells PNDs and software including the "IQ Routes" system, which gathers travel data and uses the data to recommend routes with the shortest travel times. Finally, TomTom sells PNDs and software with the "HD Traffic" system, which uses real-time traffic data to recommend routes with shorter travel times.

Defendant and counterclaim plaintiff Michael Adolph, an individual residing in Germany, is the inventor and owner of the '836 patent, entitled "Method and Device for Generating, Merging and Updating of Destination Tracking Data," issued March 12, 2002. TomTom's complaint originally named AOT Systems GmbH ("AOT"), a German corporation established by defendant Dr. Adolph in 2000, with its principal place of business in Germany. AOT is the exclusive licensee of the '836 patent. On August 3, 2012, TomTom amended its complaint to add Dr. Adolph as a second defendant. On September 14, 2012, AOT's motion to dismiss for lack of personal jurisdiction was granted, and all claims against AOT were dismissed, leaving Dr. Adolph as the sole defendant. *TomTom, Inc. v. AOT Systems GmbH*, Case No. 1:12-cv-528 (E.D. Va. Sept. 14, 2012) (Order).

The '836 patent, which consists of 53 claims, recites in the two claims at issue—independent claim 1 and dependent claim 22—a method for generating and updating travel data for use in a destination-tracking system. This system, according to the claims in issue, includes the generation and storage of data by mobile units to record real routes and traffic conditions.

In February and March 2011, AOT sent two letters to TomTom alleging that TomTom infringed the '836 patent and its European counterparts and threatening to take legal action. On June 28, 2011, representatives of TomTom, Dr. Adolph, and AOT met in person to discuss the '836 patent. TomTom alleges that during the course of this meeting, representatives of Dr. Adolph and AOT reiterated the allegation that TomTom infringes the patent and its European

-2-

A2

counterparts, and they stated their intention to enforce those patents against TomTom. Dr.

Adolph, in turn, alleges that, during the course of this meeting, the parties discussed AOT and

Dr. Adolph's offer to license the German counterpart of the '836 patent, but that the parties were

unable to reach any licensing agreement.

On February 3, 2012, AOT filed a lawsuit in Germany against TomTom's customer,

REWE Unterhaltungselektronik GmbH, seeking damages and injunctive relief for REWE's sales

of TomTom products that AOT asserts infringe a European counterpart to the '836 patent.

Thereafter, on May 11, 2012, TomTom filed this declaratory judgment suit, alleging that the

'836 patent is invalid as obvious and anticipated by prior art, and that, in any event, TomTom

does not infringe any valid claims of the '836 patent. On October 3, 2012, Dr. Adolph filed a

counterclaim against TomTom, alleging that TomTom directly and indirectly infringes the '836

patent.

The '836 patent consists of 53 claims. Claims 1 and 22, the sole claims in issue, read as

follows:

> 1. A method **for generating and updating data for use in a destination
> tracking system of at least one mobile unit** comprising:
>
> Generating and **storing traveled distance data in at least one storage device**
> provided in said mobile unit at least at predetermined time intervals, wherein the
> traveled distance data represent traveled sections by at least a series of nodes $P_i$
> and **to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned;**
>
> Generating and storing **section data** in the **storage device** provided in the mobile
> unit, said section data being generated by **selecting, from the traveled distance
> data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$, to which at least**
> their geographical starting point and end point are assigned; and
>
> Generating a section data file from the section data and **storing the section data
> file in the storage device** provided in the mobile unit, said section data file being
> continuously supplemented and/or updated with section data newly generated by
> the mobile unit.

-3-

A3

22. The method according to claim 1, further comprising the step of determining **absolute coordinates of the mobile unit** using the Global Positioning System.

The parties dispute the meaning of the following nine claim terms or phrases, bolded above, in claims 1 and 22.

(i)     "to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned," as used in claim 1;

(ii)    "absolute coordinates of the mobile unit," as used in claim 22;

(iii)   "generating and updating data for use in . . . ," as used in the preamble of claim 1;

(iv)    "destination tracking system of at least one mobile unit," as used in the preamble of claim 1;

(v)     "section data," as used in claim 1;

(vi)    "selecting from the traveled distance data, nodes $P_j$ and $P_k$ which define contiguous sections $P_jP_k$," as used in claim 1;

(vii)   "storing traveled distance data in at least one storage device," as used in claim 1;

(viii)  "storing section data in the storage device," as used in claim 1; and,

(ix)    "storing the section data file in the storage device," as used in claim 1.

Further, TomTom argues that the term "storage device" in claim 1 is fatally indefinite and therefore cannot be construed. This argument, as explained below, is unpersuasive; the term "storage device" is not fatally indefinite, and therefore its meaning in claim 1 must be addressed.

## A.

A brief review of the prosecution history and prior art is central to a proper construction of the patent's disputed claim terms and phrases.

-4-

A4

In 1997, the priority date for the '836 patent,[2] consumers were beginning to use GPS

units for navigation while driving. At that time, GPS units provided navigation by continuously

analyzing the location of a moving vehicle and comparing that position data with stored road

network data. The purposes of these GPS units were (i) to guide drivers to their destinations and

(ii) to help drivers avoid areas of congestion or traffic obstructions while driving to their

destination. Not surprisingly, therefore, substantial prior art exists in this technology field, and

thus, it is equally unsurprising that the prosecution history of the '836 patent reflects various

efforts to distinguish the prior art.

The USPTO examiner in October 2000 issued a first Office Action with regard to the

'836 patent application, rejecting certain pending claims of the '836 patent application, including

claims 1 and 22, as anticipated by U.S. Patent No. 4,982,332 ("the Saito patent"). In doing so,

the patent examiner stated that the Saito patent discloses the method of claim 1 and discloses

generation of road data that involves adding new roads into a map database for use in an on-

board navigational system. The patent examiner also rejected claim 22 because the Saito patent

discloses that absolute coordinates of the mobile unit are determined using GPS technology.

Dr. Adolph, the '836 patent applicant, responded on February 28, 2001 by distinguishing

the '836 patent on several grounds. First, Dr. Adolph explained that the '836 invention collects

not only the geographic points of each section traveled, but also the direction of travel between

the points and the traveled distance, the time relationship between the traveled points, and the

fact that the traveled points are contiguous. Moreover, under the '836 patent, new geographic

information will be stored each time the GPS unit travels a route at a different speed because the

recording intervals are time based, so each time a different speed is used, different geographic

---

[2] The priority date for the European counterpart to the '836 patent, EP 0 988 508, is December 8, 1997.

data is located.  Finally, whereas the Saito patent requires loading an initial database representing roadways into the system before additional travel information is collected, the '836 patent does not require loading any initial information relating to existing road networks in order to start generating and storing travel data.

On April 2, 2001, the patent examiner issued a second Office Action that maintained the rejection of claim 1 as anticipated by the Saito patent.  Furthermore, the patent examiner stated that claim 1 was also anticipated by PCT Patent Appl. Publ. No. WO 92/02891 to Thad *et al.* ("Thad").  Dr. Adolph submitted a response to this Office Action, distinguishing the Saito patent again on the grounds stated in the response to the first Office Action, namely, (1) that the Saito patent only stores points as coordinates, while the invention generates and stores section data consisting of the time relationship between traveled points, the direction of travel from one point to the next, and the fact that the points are connected; and (2) that the storage medium in the Saito patent cannot be updated, whereas the storage data file section of the '836 invention can be updated.  Furthermore, Dr. Adolph stated that the Thad reference only uses a GPS receiver to determine and store coordinates according to criteria that does not include time information or information about continuous sections. On August 29, 2001, the patent examiner allowed claims 1-53 of the '836 patent, which issued on March 12, 2002.

## II.

Over the nearly two decades since *Markman*, the elucidation of claim construction principles has become well-plowed ground, although the plowed furrows have not always been clear or straight lines.  Nonetheless, the claim construction principles pertinent here are now well-settled.  They are as follows:

-6-

A6

Patent terms are presumed to have their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Accordingly, a person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

In the event that a claim phrase or claim term's ordinary meaning is not apparent, then a court may—as would a person of ordinary skill in the art—look to "the words of the claims themselves,…the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water*, 381 F.3d at 1116. In this regard, it is important to note that courts must adhere to the following hierarchy of evidence in construing disputed patent claim phrases and terms: (i) the claim language, (ii) the other intrinsic evidence—*i.e.*, the specification and the prosecution history, and (iii) the extrinsic evidence—*i.e.*, evidence that is external to the patent and prosecution history, such as expert testimony or treatises. *See Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1304 (Fed. Cir. 2001). Thus, as the Federal Circuit has consistently made clear, the claim construction effort should focus first on the claim language and other intrinsic evidence, only proceeding to examine extrinsic evidence if the intrinsic evidence does not yield an answer. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Philips*, 415 F.3d at 1317 (stating that extrinsic evidence is "less significant"

A7

than intrinsic evidence). Of course, courts, in construing claim terms, may always use extrinsic evidence to aid their understanding of the patent technology. *See Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995) ("The court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent.") (internal citations omitted).

Given the hierarchy of claim construction evidence, "the claim construction analysis must begin and remain centered on the claim language itself" because a "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc.*, 381 F.3d at 1115–16. Thus, a court must "look to the words themselves…to define the scope of the patented invention." *Vitronics Corp.*, 90 F.3d at 1582. Comparison of disputed claim terms to other claims in the patent, both disputed and undisputed, is often illuminating because "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Furthermore, according to the doctrine of claim differentiation, there is a presumption "that each claim in a patent has a different scope." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). In its most specific sense, the doctrine of claim differentiation means that limitations stated in dependent claims "are not to be read into the independent claim from which they depend." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999). But because two claims with different terminology can define the exact same subject matter,[3] Federal Circuit has cautioned that "claim differentiation is a guide, not a rigid rule." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991).

---

[3] *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n. 15 (Fed. Cir. 1990)

-8-

A8

In the event the language of the claim itself does not make the meaning of a claim term or phrase clear, specification is "the single best guide to the meaning of a disputed term" and is often "dispositive." *Phillips*, 415 F.3d at 1315. Yet, courts must be cautious in using the specification to avoid importing into the claims embodiments described in the specification and thereby limiting the scope of the claims. In this respect, there is "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Id.* at 1323. Indeed, to read "a limitation from the written description into the claims" is a "cardinal sin" of patent claim construction. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–41 (Fed. Cir. 2001).

A further important element of intrinsic evidence is the patent's prosecution history— also commonly referred to as the patent's "file wrapper"—which may be considered for the purpose of determining whether to "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation and quotation marks omitted). Thus, if a patentee "has unequivocally disavowed a certain meaning to obtain his patent," the claim is narrowed "congruent with the scope of surrender," and the patentee may not later recapture through claim interpretation a claim term meaning disclaimed during prosecution and thereby recapture in the Markman process a scope of the patent surrendered during prosecution. *Id.* A patentee may not construe terms one way "in order to obtain their allowance and in a different way against accused infringers." *Id.*

It is true, of course, that "a patentee is free to be his own lexicographer" and to give claim terms his own specific meaning. *Markman*, 52 F.3d at 980. When a patentee acts as his own lexicographer, he may "use terms in a manner other than their ordinary meaning[.]" *Vitronics*, 90 F.3d at 1582. Importantly, a patentee acting as his own lexicographer must "define the

A9

specific terms used to describe his or her invention . . . with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Thus, any statement in the specification relied on to support the contention that the patentee acted as his own lexicographer "must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Although a patentee may "define claim terms by implication," the implied redefinition must also "be so clear that it equates to an explicit one." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012).

Particularly pertinent here is the claim construction principle that governs where a party to the claim dispute argues that a disputed claim term or phrase should be given its plain and ordinary meaning and no construction is necessary. That principle recognizes that courts are not required to construe every disputed term, for the overarching goal of claim construction is to aid the jury's understanding of claim terms, not to be an "exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). But "when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute" and "the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008). Accordingly, if a claim term has more than one ordinary meaning, it must be construed. *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2004). Furthermore, a court must construe a term if giving the term its plain and ordinary meaning will not address the disputed scope of the term, only its disputed meaning. *O2 Micro Int'l Ltd.*, 521 F.3d at 1361-62 (construing the term "only if" because giving the phrase its plain and ordinary meaning left open the question regarding the situations to which "only if" applied).

Thus, the claim construction analysis here begins with the application of these principles to the disputed claim terms and phrases. But importantly, as the Federal Circuit has noted, these "axioms themselves seldom provide an answer, but instead merely frame the question to be resolved." *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). Indeed, the Federal Circuit's guidance on claim construction does "not attempt to provide a rigid algorithm, but simply attempt[s] to explain why, in general, certain types of evidence are more valuable than others." *Phillips*, 415 F. 3d at 1324. It remains now to apply these principles to the portions of claims 1 and 22 in dispute here.

### III.

**A. "to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned" (Claim 1) and "absolute coordinates" (Claim 22)**

Dr. Adolph proposes that the plain and ordinary meaning of "node," "geographical coordinates," and "absolute coordinates" suffices for these terms and phrases, and thus, further construction is not required. TomTom disagrees, arguing that failure to construe these terms would not resolve a dispute in their meaning,[4] and further arguing that "to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned" should be construed as "to each intersection in a grid or road network Cartesian coordinates x and y, different from the latitude and longitude of that intersection, are assigned," and "absolute coordinates" should be construed as "latitude and longitude."

The parties' competing constructions of these two phrases make clear that two aspects of construction are at issue: (1) whether "node" means "location reading" or the more restrictive "intersection in a grid or road network;" and (2) whether "geographical coordinates" may be

---

[4] *O2 Micro Int'l Ltd.*, 521 F.3d at 1361.

-11-

given its plain and ordinary meaning or must instead be construed as "Cartesian coordinates, different from the latitude and longitude of that intersection." The latter phrase, in turn, requires construction of the phrase "absolute coordinates" in dependent claim 22.

### 1. "node"

TomTom argues that the term "node" should be construed as "an intersection in a grid or road network," while Dr. Adolph argues that "node" should be construed as "location reading." Neither proposal is adequately faithful to the intrinsic evidence. As the specification makes clear, nodes can be any of the following:

(1) "nodes at the intersection of sections," Col. 10, ll. 17-18;

(2) "nodes where the vehicle direction changes by more than a given predetermined value," Col. 10, ll. 16-17; and

(3) "origin and/or destination nodes," Col. 12, l. 21.

TomTom argues in its brief that the '836 specification makes clear that only points lying at the intersection of a grid or road network are nodes. But restricting the term "node" to intersections would not encompass the types of nodes discussed elsewhere in the patent and would be unnecessarily confusing to a jury. Furthermore, Dr. Adolph's definition—"location reading"—is far broader than the specification, which restricts nodes to certain types of locations. Accordingly, the term "node" must be construed as "intersection, origin, destination, or point at which the vehicle changes direction by more than a given predetermined value in a grid or road network."[5]

---

[5] The intrinsic evidence does not disclose or quantify the degree of change in direction that would create a node, nor do the parties argue how much the degree of change in direction should be. Presumably, this reflects that the degree of change in direction is not material to the parties' infringement or validity positions.

### 2. "geographical coordinates $x_i$ and $y_i$" and "absolute coordinates"

Dr. Adolph argues that "geographical coordinates" in claim 1 and "absolute coordinates" in claim 22 must be given their plain and ordinary meaning. TomTom argues that "absolute coordinates" must be construed as "latitude and longitude," and that "geographical coordinates" must be construed as "Cartesian coordinates, different from latitude or longitude." Because TomTom offers no sound reason why the plain and ordinary meaning of the terms "geographical coordinates" and "absolute coordinates" is not adequate, the plain and ordinary meanings suffice to construe the terms.

First, TomTom argues that absolute coordinates in claim 22 and geographic coordinates in claim 1 must be different types of coordinates because of the doctrine of claim differentiation, which is "the presumption that each claim in a patent has a different scope." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004). TomTom states that "absolute coordinates" should be construed as "latitude and longitude" based on a sentence in the specification stating, "A navigational GPS (global positioning system) receiver produces data which give the geographical position of the control device of the mobile unit by, for instance, geographical latitude and longitude." Col. 8, ll. 26-29. And because TomTom argues that the doctrine of claim differentiation prohibits assigning the same meaning to "absolute coordinates" in claim 22 and "geographic coordinates" in claim 1 from representing the same type of coordinates, TomTom proposes that "geographic coordinates" should be construed as "Cartesian coordinates $x_i$ and $y_i$, different from latitude and longitude."

Yet, using TomTom's constructions poses three problems. First, the doctrine of claim differentiation does not apply to the term "geographic coordinates" in claim 1 and the term "absolute coordinates" in claim 22. Even if the coordinates discussed in the two claims had the

-13-

A13

same meaning,[6] claims 1 and 22 would still be different in scope, and hence claim differentiation would not apply. *Comark Communications, Inc.*, 156 F.3d at 1187 (stating the presumption that each claim in a patent must have a different scope). Claim 1, which discusses how geographical coordinates $x_i$ and $y_i$ are assigned to each node in a series of nodes that represents traveled distance data, does not mention determining coordinates via Global Positioning System ("GPS"). In contrast, claim 22 states a method, dependent on claim 1, "further comprising the step of determining absolute coordinates of the mobile unit using the Global Positioning System." Col. 19, ll. 22-24. Thus, even if the "absolute coordinates" in claim 22 were the same type of coordinates as the "geographic coordinates" in claim 1, claim 22 would still be different in scope because it adds the step of determining those coordinates using a GPS. Accordingly, the claim differentiation principle does not support TomTom's argument.

Second, TomTom's construction of "geographic coordinates" is not supported by the intrinsic evidence. TomTom argues that "geographic coordinates" should be construed as "Cartesian coordinates," but the phrase "Cartesian coordinates" does not appear in the claims, the specification, or the prosecution history. In fact, TomTom offers no persuasive argument in its briefs in support of using Cartesian coordinates, only claiming that "the '836 patent clearly contemplates using what both parties agree is a Cartesian system" based on the fact that Figures 3-10 in the specification "depict points 'in a flat plane' such that a point can be located by its distances from two intersecting straight lines." *TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 167 at *8 (E.D. Va. March 8, 2013). TomTom does not explain why the depiction of points in a flat plane compels an inference that geographic coordinates must be

---

[6] Furthermore, as the Federal Circuit has stated, "two claims with different terminology can define the exact same subject matter." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.* 438 F.3d 1374, 1381 (Fed. Cir. 2006).

Cartesian coordinates, nor does TomTom cite to any other extrinsic or intrinsic evidence in support of that conclusion. TomTom's arguments are not sufficient to rebut the presumption that a plain and ordinary meaning of "geographic coordinates" is sufficient to define the term.[7] Accordingly, "geographic coordinates" is construed according to its plain and ordinary meaning—that is, "coordinates that locate a node geographically."

Finally, TomTom's construction of "absolute coordinates" is not supported by the intrinsic evidence. TomTom states that its construction of the term "absolute coordinates" as "latitude and longitude" is supported by the specification, which states, "A navigational GPS (global positioning system) receiver produces data which give the geographical position of the control device of the mobile unit *by, for instance, geographical latitude and longitude*." Col. 8, ll. 26-29 (emphasis added). But the portion of the specification cited by TomTom makes clear through use of the phrase "for instance" that "geographical latitude and longitude" is a *type* of absolute coordinate system used by the GPS, not the only possible absolute coordinate system used by the GPS. Thus, TomTom's argument is a violation of the principle that embodiments should not be used to limit the scope of a claim. *Phillips*, 415 F.3d at 1323. Accordingly, it is appropriate to construe "absolute coordinates" according to its plain and ordinary meaning, namely, that, "coordinates that locate a node geographically and represent the absolute position of the mobile unit."

## B. "generating and updating data for use in" and "a destination tracking system of at least one mobile unit"

TomTom next seeks to construe the meaning of the phrases "generating and updating data for use in" and "a destination tracking system of at least one mobile unit," which appear in

---

[7] *Phillips*, 415 F.3d at 1313 ("We have frequently stated that the words of a claim are generally given their ordinary and customary meaning.").

the preamble to claim 1. Dr. Adolph argues that construing the preamble is unnecessary because it merely states the purpose or intended use of the invention and therefore should not be treated as limiting the scope of the claim.

Dr. Adolph is correct that a preamble merely stating the purpose or intended use of the invention should not be used to limit the claim's scope. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). If the body of the claim "sets out the complete invention, the preamble is not ordinarily treated as limiting the scope of the claim." *Biocon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). Yet, as the Federal Circuit has also noted, "a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The preamble gives meaning to the claim when part of the claim relies on a preamble phrase for "antecedent basis," which indicates "a reliance on both the preamble and claim body to define the claimed invention." *Id.*[8] If the claim drafter "chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

Here, the preamble must be construed because part of the claim relies on the preamble for antecedent basis. The preamble to claim 1 states that it is "a method for generating and updating data for use in a destination tracking system of *at least one mobile unit*." Col. 17, ll. 36-37

---

[8] *See also Biocon, Inc.,* 441 F.3d at 952-53 (finding a preamble limiting because "the body of the claim does not recite the complete invention, but refers back to the features…described in the preamble, so that the references…in the body of the claim derive their antecedent basis from the preamble").

-16-

A16

(emphasis added). The first step of claim 1 refers to "said mobile unit." Col. 17, l. 40. There is

no other mobile unit mentioned before "said mobile unit" except in the preamble to claim 1. It is

abundantly clear that the mobile unit referred to by the first step in claim 1 is the mobile unit in

the preamble to claim 1. Thus, because claim 1 relies on its preamble for antecedent basis, the

disputed claim terms in the preamble must be construed.[9]

### 1. "generating and updating data for use in..."

TomTom argues that the phrase "generating and updating data for use in..." in the

preamble to claim 1 should be construed to clarify that "the data generated and updated by the

mobile unit is used by that unit."[10] TomTom's proposed construction is correct based on the

specification and prosecution history of the '836 patent.

The patent specification explicitly distinguishes a "destination tracking system" that

collects data and then uses the collected data, such as the destination tracking system described

in the '836 patent, from a "traffic control system" that only collects data but does not use it. This

distinction is explicitly recognized in the '836 patent specification, which, in describing prior art

U.S. Pat. No. 4,350,970 A1, states:

> [Patent '970] describes a method for recording the travel time of a vehicle
> between two given nodes, and for transmitting said travel times to a
> computer...Said master computer then compares the travel times with average
> values; if there are significant deviations, another route is proposed to subsequent
> vehicles. The transmitting vehicle does not receive the revised result. In other
> words it is a traffic control system and not a destination tracking system.

---

[9] *See, e.g., Eaton Corp. v. Rockwell Intern. Corp.*, 323 F.3d 1332 (Fed. Cir. 2003) (finding the preamble to be limiting on a claim when the language of the claim referred to "said vehicle master clutch" and "said drive train," which referred back to the particular clutch and the particular drive train described in the preamble)

[10] Dr. Adolph does not offer a construction of this phrase because he argues that the preamble does not need to be construed.

The patent specification goes on to describe the '836 patent as using "section data file stored in the mobile unit [to extend and/or update continuously]" the route traveled by that mobile unit, which allows "a highly topical route recommendation [to be] presented, at any time," to that specific mobile unit.  Col. 4, ll. 14-20.  Thus, the specification clearly distinguishes the system described in the '836 patent from the system described in a prior patent, in which a vehicle's travel data was collected but not subsequently used by that vehicle.  Furthermore, during the prosecution of the '836 patent, Dr. Adolph represented to the patent examiner, in attempting to distinguish claim 1 of the '836 patent from the Saito patent, "In the present invention, 'traveled distance data are generated *and are used* for automatically generating a digital route network." *TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 183, Ex. K at *4 (E.D. Va. Mar. 8, 2013) (emphasis added).  Accordingly, because intrinsic evidence clearly establishes that the invention both collects data and uses the collected data, the term "generating and updating data for use in…" in the preamble to claim 1 must be construed to mean that "the data generated and updated by the mobile unit is used by that unit."

### 2. "destination tracking system of at least one mobile unit"

TomTom argues that the phrase "a destination tracking system of at least one mobile unit" should be construed as "portable navigation device that does not contain initial information relating to existing road networks."[11]  The prosecution history makes clear that TomTom's construction is correct.

During the prosecution of the '836 patent, Dr. Adolph argued that his claimed invention differed from the Saito patent because "Saito requires that an initial database representing road data or roadways be loaded into the system before the additional acquisition of data can take

---

[11] Dr. Adolph does not offer a construction of this phrase because he argues that the preamble does not need to be construed.

place," while the '836 patent "allows even a single mobile unit to commence generating and

storing data without the need for any additional information relating to existing road networks."

*TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 167, Ex. F at *13 (E.D. Va. Feb.

22, 2013). Clearly, then, Dr. Adolph distinguished the '836 patent from prior art by pointing out

that the '836 patent allows for generation of travel data "without the need for any initial

database." *TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 167, Ex. C at *5

(E.D. Va. Feb. 22, 2013).

    These representations made by Dr. Adolph during the prosecution of the '836 patent are

binding during claim construction. As the Federal Circuit has stated, "prosecution history

constitutes a public record of the patentee's representations concerning the scope and meaning of

the claims, and competitors are entitled to rely on those representations." *Hockerson–*

*Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000). Where, as here,

"an applicant argues that a claim possesses a feature that the prior art does not possess in order to

overcome a prior art rejection, the argument may serve to narrow the scope" of the claim.

*Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005). To avoid the

patent examiner's argument that claim 1 of the '836 patent was anticipated by the Saito patent,

Dr. Adolph argued during prosecution that, contrary to the Saito patent, the '836 patent does not

require an initial map database.[12] Thus, Dr. Adolph overcame the Saito prior art by limiting

claim 1 to a method that necessarily does not include an initial map database.[13] Accordingly,

---

[12] *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (stating that "when a claim covers several structures...the claim is deemed anticipated if any of the structures...within the scope of the claim is known in the prior art").

[13] *See, e.g., Computer Docking Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1376-79 (Fed. Cir. 2008) (holding prosecution statements limiting when those statements distinguished prior art as

because claim 1 is narrowed by the prosecution history, "destination tracking system of at least

one mobile unit" must be construed, as TomTom argues, as "destination tracking system of at

least one mobile unit that does not contain initial information relating to existing road

networks."[14]

### C. "section data" and "selecting, from the traveled distance data nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$"

The second step of claim 1 claims the method for "generating and storing section

data…said section data being generated by selecting, from the traveled distance data, nodes $P_j$

and $P_k$, which define the contiguous sections $P_jP_k$." The parties raise two disputes concerning the

scope of claim limitations: (1) the definition of "section data," and (2) how nodes are selected to

generate section data.

#### 1. "section data"

Dr. Adolph argues that the term "section data" can be given its plain and ordinary

meaning and therefore need not be construed. TomTom argues that "section data" should be

construed as "data generated from traveled distance data reflecting (a) that traveled nodes $P_j$ and

$P_k$ are connected to each other, (b) the direction of travel from $P_j$ to $P_k$, and (c) the distance

traveled from $P_j$ to $P_k$." Contrary to Dr. Adolph's argument, the plain and ordinary meaning does

not suffice to define the term "section data," because reliance on the plain and ordinary meaning

of the term would not "resolve the parties' dispute." *O2 Micro Int'l Ltd.*, 521 F.3d at 1361.

---

"requiring a portable display and keyboard" whereas the invention did not require a built-in
display and keyboard).

[14] TomTom presents no argument or evidence why the phrase "destination tracking system"
cannot be construed according to its plain and ordinary meaning and must instead be construed
as "portable navigation device."

TomTom's construction of the term, based on Dr. Adolph's representations during the

prosecution history of the '836 patent, is correct.

Intrinsic evidence, specifically the prosecution history, makes clear that Dr. Adolph

presented a definition of the term "section data" that is not the term's plain and ordinary

meaning. In an attempt to distinguish the '836 patent from the Saito prior art, Dr. Adolph

argued, "Claim 1 specifically claims that in its simplest implementation it not only records the

geographic location of points $P_j$ and $P_k$ but the fact that they are connected to each other, that

there is a direction of travel from $P_j$ to $P_k$, and a traveled distance." *TomTom, Inc. v. AOT*

*Systems GmbH, et al.*, 1:12-cv-528, Doc. 167, Ex. C at *3-4 (E.D. Va. Feb. 22, 2013). Thus, it is

clear that Dr. Adolph disavowed a plain and ordinary meaning of the term "section data" when

he presented this argument during the patent's prosecution history. *See Computer Docking*

*Station*, 519 F.3d at 1374 (holding that a patentee disavows claim scope "by clearly

characterizing the invention in a way to try to overcome rejections based on prior art").

Accordingly, based on the prosecution of the '836 patent, the term "section data" must be

construed as "data generated from traveled distance data reflecting (a) that traveled nodes $P_j$ and

$P_k$ are connected to each other, (b) the direction of travel from $P_j$ to $P_k$, and (c) the distance

traveled from $P_j$ to $P_k$."

## 2. "selecting, from the traveled distance data nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$"

Claim 1 requires that section data, as defined above, be generated by "selecting, from the

traveled distance data nodes $P_j$ and $P_k$, which define continuous sections $P_jP_k$." The parties

dispute how those nodes, which define a contiguous section, are selected. Dr. Adolph argues

that the phrase should be construed as having its plain and ordinary meaning, and TomTom

-21-

A21

argues that the phrase should be construed as "selecting from the traveled distance data, the nodes that are most characteristic of a road segment and dropping the intermediate nodes of that segment, whereby the end of one section is the start of the next section." Dr. Adolph's argument that the phrase does not need to be construed and may instead be given its plain and ordinary meaning is unpersuasive. Reliance on the plain and ordinary meaning of the phrase "does not resolve the parties' dispute,"[15] and the intrinsic evidence points persuasively to the construction of the phrase argued by TomTom.

The portion of the patent that describes the generation of section data teaches that "section data are generated from the traveled distance or route data stored in the trip storage unit, compressing the traveled distance data by dropping individual points...and choosing those points $P_j$ and $P_k$, which are most...characteristic in defining a section of the route." Col. 10, ll. 8-14. Thus, the patent specification teaches that generation of section data requires selecting "characteristic" nodes of a segment while dropping the nodes in between which are non-characteristic of that segment.

Furthermore, the patent prosecution history shows that claim 1 requires that the actual sections $P_j$ and $P_k$ are contiguous such that the end of one section is the start of the next section. To overcome a prior art rejection, Dr. Adolph argued during the prosecution that "additional sections are stored in a contiguous fashion in order to store a route connecting the initial starting point of the vehicle to the final destination." Storing sections not connected to one another would not store a route connecting the initial starting point of the vehicle to the final destination, as required by the patent.

_____

[15] *O2 Micro Int'l Ltd.*, 521 F.3d at 1361.

Accordingly, the phrase "selecting, from the traveled distance data nodes $P_j$ and $P_k$, which define continuous sections $P_jP_k$" is construed as "selecting from the traveled distance data, the nodes that are most characteristic of a road segment and dropping the intermediate nodes of that segment, whereby the end of one section is the start of the next section."

### D. "storage device" claims

The parties next dispute the meaning of several phrases in claim 1 that use the term "storage device." The first step of claim 1 requires "storing traveled distance data in at least one storage device." The second and third steps of claim 1 then require, respectively, "storing section data in the storage device, and "storing the section data file in the storage device."

### 1. "storing traveled distance data in at least one storage device"

Dr. Adolph argues that "storing traveled distance data in at least one storage device" should be given its plain and ordinary meaning. TomTom disagrees, arguing instead that the phrase should be construed to mean "storing in non-volatile memory the entire traveled distance data generated by a trip such that section data can then be generated." TomTom's argument, which relies on irrelevant expert testimony, is unpersuasive.

TomTom argues that the construction of "storage device" must be specified to make clear that storage devices must be something more than volatile or temporary RAM memory. Yet, TomTom does not cite to any intrinsic evidence on this point, nor can it do so, because the claim language, patent specification, and prosecution history are silent on the question of volatile and non-volatile memory. Instead, TomTom asserts that generating section data from stored traveled distance data requires "something more than volatile RAM memory, which is temporary storage incapable of retaining data for extended periods of time." *TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 167 at *22 (E.D. Va. Feb. 22, 2013). TomTom bases this assertion on

-23-

A23

the testimony of Dr. Adolph's expert, who stated during a deposition, "Because I believe that Dr. Adolph, when he talks about these store [sic] units, I believe they are permanent storage units, and not just RAM." *TomTom, Inc. v. AOT Systems GmbH, et al.*, 1:12-cv-528, Doc. 167, Ex. D (E.D. Va. Feb. 22, 2013).

To be sure, where, as here, the intrinsic evidence is silent as to the meaning of a disputed claim term, it is appropriate to refer to extrinsic evidence to determine the meaning a person of ordinary skill in the art would give to the disputed claim term. *Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991 (Fed. Cir. 2006).[16] Yet, TomTom's proffered expert evidence—the testimony of Dr. Adolph's expert—falls far short of being relevant or persuasive extrinsic expert testimony on the meaning that a person of ordinary skill in the art would give the disputed claim term "storage device." As the Federal Circuit has consistently noted, expert testimony consisting of conclusory statements or unsupported assertions is of little to no value, especially if the expert does not identify "a particular meaning in the art." *General Protecht Group, Inc. v. International Trade Com'n*, 619 F.3d 1303, 1310-1311 (Fed. Cir. 2010). In other words, "an expert's subjective understanding of a patent term is irrelevant." *Id.*[17] Here, Dr. Adolph's expert's

---

[16] *See also Symantec Corp. v. Computer Associates Intern, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) (approving the reference to a "dictionary of computing" for assistance in construing a term because the claim term language, specification, and prosecution history were silent on the term's meaning).

[17] *See also Southern Mills, Inc. v. Polartec, LLC*, 377 Fed. Appx. 2, 6-7 (Fed. Cir. 2010) (finding expert's testimony unhelpful because it consisted only of a recitation of how the expert would construe the term, not an explanation of its "accepted meaning in the field to one skilled in the art"); *Symantec Corp.*, 522 F.3d at 1291 (stating that expert testimony that does not "identify the accepted meaning in the field to one skilled in the art is unhelpful"); *Sinorgchem Co., Shandong v. International Trade Com'n*, 511 F.3d 1132, 1137 (Fed. Cir. 2007) (according little or no weight to expert testimony about the meaning of specification terms where the expert failed to present evidence of the generally accepted meaning of those terms to persons of ordinary skill in the art).

-24-

A24

testimony is at most that expert's subjective understanding of the term "storage device" and is not testimony about the accepted meaning in the field to one skilled in the art. Accordingly, this testimony is irrelevant and unpersuasive.

In sharp contrast, Dr. Adolph's evidence regarding the plain and ordinary meaning of the term "storage device"—its definition in "Webster's New World History of Computer Terms"—is relevant and helpful. As the Federal Circuit has stated, "it is entirely appropriate for [a] district court to look to dictionaries or other extrinsic sources for context to aid in arriving at the plain meaning of a claim term." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Technical dictionaries such as the one cited by Dr. Adolph are especially helpful because they provide "the way in which one of skill in the art might use the claim terms." *Vitronics*, 90 F.3d at 1584 n. 6. Such technical dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. The technical dictionary cited by Dr. Adolph defines the term "storage device" as "[a] device used for storing data within a computer, such as a hard disk, floppy disk, magnetic tape, and RAM." Accordingly, the disputed claim term "storage device" is properly construed to have its plain and ordinary meaning, and it is appropriate to derive this plain and ordinary meaning from the technical dictionary as "device used for storing data." Furthermore, because TomTom presents no argument regarding construction of the rest of the phrase, the phrase "storing traveled distance data in at least one storage device" is construed according to its plain and ordinary meaning of "storing traveled distance data in at least one device used for storing data."

**2. "storing section data/the section data file in the storage device"**

The parties next dispute the meaning of the phrases "storing section data in the storage device" and "storing the section data file in the storage device." Dr. Adolph argues that the

phrases should be given their plain and ordinary meaning and therefore need not be construed. TomTom argues that the two phrases are indefinite because they lack an adequate antecedent basis and therefore cannot be construed. The first part of claim 1 refers to storing traveled distance data "in at least one storage device," while parts two and three refer to storing data in "the storage device." TomTom argues that, because parts two and three do not specify a specific storage device, those parts of the claim are indefinite. Because an person of ordinary skill in the art would be able to understand the meanings of the term, TomTom's argument is unpersuasive.

The Federal Circuit has stated that a claim term is indefinite if "competitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention." *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993). But "a claim is not indefinite merely because it poses a difficult issue of claim construction." *Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). If the meaning of the claim is discernible, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," a claim should not be held invalid on indefiniteness grounds. *Exxon Research & Engineering Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Moreover, the mere fact that there may not be an explicit antecedent basis for a term does not render it indefinite. Even lacking an explicit antecedent basis, a claim is not indefinite "if the scope of the claim would be reasonably ascertainable to those in the art." *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001). Here, the meaning of the claim can be understood by persons of ordinary skill in the art when read in light of the specification, and thus the claim is not fatally indefinite. This is so because the specification makes clear that section data is stored in a "section data storage unit" storage device, section data files are stored in the "section data file storage unit" storage device, and "traveled distance data" is stored in a "trip

-26-

A26

storage unit or motion storage unit" storage device. Col. 9, ll. 21-25. Despite the lack of explicit

antecedent basis regarding where "section data" and "the section data file" are stored, a person of

ordinary skill in the art would understand the meaning of claim 1 in light of the information

contained in the patent specification, and thus, the phrases "storing section data in the storage

device" and "storing the section data file in the storage device" are not indefinite.

Alternatively, TomTom argues that "storing section data in the storage device" should be

construed as "storing, in a separate storage device than the traveled distance data and in non-

volatile memory, the entire section data generated by a trip such that the section data file can

then be generated," and TomTom further argues that "storing section data file in the storage

device" should be construed as "storing the section data file in non-volatile memory, in a

separate storage device than the traveled distance data and section data."[18]  Essentially, TomTom

seeks to have these two terms construed to mean that "traveled distance data," "section data,"

and "section data file" are all stored in separate storage devices.   As stated above, the patent

specification makes clear that (i) traveled distance data is stored in a "trip storage unit or motion

storage unit," (ii) section data is stored in a "section data storage unit," and (iii) the section data

file is stored in the "section data file storage unit."  Thus, the portion of TomTom's construction

that clarifies that each type of data is stored in a different storage device is the correct

construction.  *See, e.g., Phillips*, 415 F.3d at 1315 (stating that, in the event the claim's language

does not make the meaning of a term or phrase clear, specification is "the single best guide to the

meaning of a disputed term").  Accordingly, "storing section data in the storage device" is

---

[18] Because the term "section data" is not construed to exclude volatile memory, the portions of
TomTom's proposed definitions relating to non-volatile memory are no longer relevant.
Furthermore, TomTom presents no intrinsic or extrinsic evidence regarding the addition of the
phrase "the entire section data generated by a trip such that the section data file can then be
generated."  In fact, TomTom does not discuss this portion of its construction at all.

construed as "storing section data in a separate storage device than the traveled distance data,"

and "storing the section file data in the storage device" is construed as "storing the section data

file in a separate storage device than the traveled distance data and section data."

IV.

For the reasons stated above, the disputed portions of Claim 1 are determined to have the

following constructions:

- **"to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned"**

  Definition: "to each intersection, origin, destination, or point at which the vehicle

  changes direction by more than a predetermined value in a grid or road network

  geographical coordinates $x_i$ and $y_i$ are assigned"

- **"generating and updating data for use in…"**

  Definition: "generating and updating data for use in" requires that "the data generated

  and updated by the mobile unit is used by that unit."

- **"destination tracking system of at least one mobile unit"**

  Definition: "destination tracking system of at least one mobile unit that does not contain

  initial information relating to existing road networks"

- **"section data"**

  Definition: "data generated from traveled distance data reflecting (a) that traveled nodes

  $P_j$ and $P_k$ are connected to each other, (b) the direction of travel from $P_j$ to $P_k$, and (c) the

  distance traveled from $P_j$ to $P_k$."

- **"selecting from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous

  sections $P_jP_k$"**

-28-

A28

Definition: "selecting from the traveled distance data, the nodes that are most characteristic of a road segment and dropping the intermediate nodes of that segment, whereby the end of one section is the start of the next section"

- **"storing traveled distance data in at least one storage device"**

  Definition: The plain language is adequately clear and needs no further definition.

- **"storing section data in the storage device"**

  Definition: "storing section data in a separate storage device than the traveled distance data"

- **"storing the section data file in the storage device"**

  Definition: "storing the section data file in a separate storage device than the traveled distance data and section data"

The disputed portion of Claim 22 is determined to have the following construction:

- **"absolute coordinates of the mobile unit"**

  Definition: The plain language is adequately clear and needs no further definition.

  An appropriate Order will issue.

Alexandria, Virginia
February 25, 2014

T. S. Ellis, III
United States District Judge

A29

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

F I L E D

FEB 2 5 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| TOMTOM, INC., | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:12cv528** |
| | ) | |
| AOT SYSTEMS GMBH, *et al.*, | ) | |
| **Defendants.** | ) | |

## ORDER

The matter came before the Court for a *Markman*[1] claim construction determination. The matter was fully briefed and argued. The nine terms and phrases in dispute are: (1) "to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned;" (2) "generating and updating data for use in...;" (3) "destination tracking system of at least one mobile unit;" (4) "section data;" (5) "selecting from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$;" (6) "storing traveled distance data in at least one storage device;" (7) "storing section data in the storage device;" (8) "storing the section data file in the storage device;" and (9) "absolute coordinates of the mobile unit."

For the reasons elucidated in a memorandum opinion of even date, it is hereby

**ORDERED** that the disputed terms are **DEFINED** as follows:

- **"to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned" (claim 1)**

  Definition: "to each intersection, origin, destination, or point at which the vehicle changes direction by more than a predetermined value in a grid or road network geographical coordinates $x_i$ and $y_i$ are assigned"

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

A30

- **"generating and updating data for use in…" (claim 1)**

  Definition: "generating and updating data for use in" requires that "the data generated and updated by the mobile unit is used by that unit."

- **"destination tracking system of at least one mobile unit" (claim 1)**

  Definition: "destination tracking system of at least one mobile unit that does not contain initial information relating to existing road networks"

- **"section data" (claim 1)**

  Definition: "data generated from traveled distance data reflecting (a) that traveled nodes $P_j$ and $P_k$ are connected to each other, (b) the direction of travel from $P_j$ to $P_k$, and (c) the distance traveled from $P_j$ to $P_k$."

- **"selecting from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$" (claim 1)**

  Definition: "selecting from the traveled distance data, the nodes that are most characteristic of a road segment and dropping the intermediate nodes of that segment, whereby the end of one section is the start of the next section"

- **"storing traveled distance data in at least one storage device" (claim 1)**

  Definition: The plain language is adequately clear and needs no further definition.

- **"storing section data in the storage device" (claim 1)**

  Definition: "storing section data in a separate storage device than the traveled distance data"

- **"storing the section data file in the storage device" (claim 1)**

  Definition: "storing the section data file in a separate storage device than the traveled distance data and section data"

- **"absolute coordinates of the mobile unit" (claim 22)**

  Definition: The plain language is adequately clear and needs no further definition.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia
February 25, 2014

/s/

T. S. Ellis, III
United States District Judge

-2-

A31

FILED

JUL - 8 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

TOMTOM, INC.,                          )
      **Plaintiff,**                    )
                                  )
      v.                              )    **Case No. 1:12-cv-528**
                                    )
AOT SYSTEMS GMBH, *et al.*,             )
      **Defendants.**                    )

## ORDER ENTERING FINAL JUDGMENT

This declaratory judgment action is a patent infringement suit. Plaintiff and counterclaim

defendant TomTom, Inc. ("TomTom"), the putative infringer of U.S. Patent No. 6,356,836 ("the

'836 patent") owned by defendant and counterclaim plaintiff Michael Adolph, seeks a

declaration that the claims of the '836 patent are invalid and that TomTom does not infringe any

valid claim of the '836 patent, which purports to cover a method for tracking data in a mobile

Global Positioning System unit. Adolph not only opposes TomTom's request for a declaration

but also counterclaims that TomTom infringes the '836 patent and seeks damages.

On February 25, 2014, a Memorandum Opinion and Order issued construing nine

disputed terms in claims 1 and 22 of the '836 patent. (Docs. 198 and 199). Now, following

claim construction, the parties have filed a joint stipulation for entry of final judgment. (Doc.

232). In the stipulation for entry of final judgment, the parties stipulate that, under the current

claim construction, TomTom does not infringe any claims of the '836 patent, and accordingly,

the parties seek a judgment of noninfringement with respect to Adolph's counterclaims of

infringement, subject to Adolph's right to appeal the decisions of the Court to the Federal

Circuit. Upon entry of the judgment of noninfringement, the remainder of TomTom's pending

claims against Adolph will be dismissed without prejudice as moot but may be revived and

1

A32

reasserted in the event Adolph is able to pursue its infringement claims against TomTom post-appeal. The parties further ask that TomTom's invalidity claims be nonsuited and dismissed without prejudice. As a result, if the Court of Appeals for the Federal Circuit alters or revises the current claim construction and thus vacates the judgment of infringement and remands the case to the district court for further proceedings, the parties will then seek to revive the validity claims and will engage again in the validity and infringement disputes.

Because the parties' agreement might be regarded as a disguised interlocutory appeal of the *Markman* determination, the Court required the parties to submit supplemental briefing setting forth whether agreements among parties of this sort pass muster with the Federal Circuit as an appropriate appeal from a final judgment. The parties submitted a joint brief and cited cases in which the Federal Circuit did not squarely address the issue, but accepted these arrangements as appropriate final judgments.[1]

Accordingly, and for the reasons set forth in the parties' Stipulation for Entry of Final Judgment,

It is hereby **ORDERED** that plaintiff and counterclaim defendant TomTom is awarded a Judgment of Noninfringement in its favor and against defendant and counterclaim plaintiff Adolph on each of Adolph's claims that TomTom has infringed the '836 patent.

It is further **ORDERED** that all claims by TomTom against Adolph are **DISMISSED** without prejudice.

The Clerk is **DIRECTED** to enter judgment in favor of plaintiff TomTom and against defendant Adolph pursuant to Rules 54(b) and 58, Fed. R. Civ. P.

---

[1] *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732 (Fed. Cir. 2014); *Jang v. Boston Scientific Corp.*, 532 F.3d 1330 (Fed. Cir. 2008); Nystrom v. Trex Co., Inc., 339 F.3d 1347 (Fed. Cir. 2003); *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354 (Fed. Cir. 2003).

A33

The Clerk is directed to send a copy of this Order to all counsel of record and to place this matter among the ended causes.

Alexandria, Virginia
July 8, 2014

_____
T. S. Ellis, III
United States District Judge

A34

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| **TomTom, Inc.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-CV-00528 |
| | ) | |
| | ) | |
| **AOT Systems GmbH, et al** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>JUDGMENT</u>**

Pursuant to the order of this Court entered on July 8, 2014 and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Plaintiff,

TomTom, Inc. and against the Defendant, Michael Adolph.

FERNANDO GALINDO, CLERK OF COURT

By:_____/s/_____
                    Judith Lanham
                    Deputy Clerk

Dated: 07/08/2014
Alexandria, Virginia

A35

US006356836B1

(12) **United States Patent**

Adolph

(10) **Patent No.:**    **US 6,356,836 B1**

(45) **Date of Patent:**    **Mar. 12, 2002**

(54) **METHOD AND DEVICE FOR GENERATING, MERGING AND UPDATING OF DESTINATION TRACKING DATA**

(76) Inventor: **Michael Adolph**, Hohenstrasse 58, D-88142 Wasserburg (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/445,873**

(22) PCT Filed: **Jun. 12, 1998**

(86) PCT No.: **PCT/EP98/03572**

§ 3/1 Date: **Apr. 6, 2000**

§ 102(e) Date: **Apr. 6, 2000**

(87) PCT Pub. No.: **WO98/57125**

PCT Pub. Date: **Dec. 17, 1998**

(30) **Foreign Application Priority Data**

Jun. 12, 1997 (DE) ........................................ 197 24 919

(51) Int. Cl.$^7$ ............................................. G01C 21/00

(52) U.S. Cl. ...................... **701/208**; 701/206; 701/207; 701/209; 701/211

(58) Field of Search ................................ 701/200, 201, 701/206, 207, 208, 209, 211, 213, 214, 215, 216

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,107,689 A | * | 8/1978 | Jellinek ..................... 701/217 |
|---|---|---|---|
| 4,350,970 A | | 9/1982 | von Tomkewitsch ......... 340/23 |
| 4,668,858 A | | 5/1987 | Heuwieser et al. ......... 235/472 |
| 4,891,761 A | * | 1/1990 | Gray et al. ................. 701/219 |
| 4,897,792 A | * | 1/1990 | Hosoi ........................ 701/208 |
| 4,982,332 A | | 1/1991 | Saito et al. ................ 364/449 |
| 5,214,757 A | | 5/1993 | Mauney et al ............... 395/161 |
| 5,430,653 A | * | 7/1995 | Inoue ........................ 701/210 |
| 5,544,061 A | * | 8/1996 | Morimoto et al. .......... 701/202 |
| 5,699,056 A | | 12/1997 | Yoshida ..................... 340/905 |

| 6,034,626 A | * | 3/2000 | Maekawa et al. ........... 340/995 |
|---|---|---|---|
| 6,064,929 A | * | 5/2000 | Migues et al. .............. 701/40 |
| 6,169,955 B1 | * | 1/2001 | Fultz ......................... 701/200 |

FOREIGN PATENT DOCUMENTS

| DE | 35 12 127 A1 | 10/1986 |
|---|---|---|
| DE | 38 28 725 A1 | 4/1989 |
| DE | 39 08 702 | 12/1989 |
| DE | 41 05 180 A1 | 8/1991 |
| DE | 40 08 460 A1 | 9/1991 |
| DE | 43 34 886 A1 | 4/1994 |
| DE | 195 34 589 A1 | 5/1996 |
| DE | 195 25 291 | 12/1996 |
| DE | 195 26 148 C2 | 2/1997 |
| EP | 0 090 965 | 10/1983 |
| EP | 0 720 137 | 7/1996 |
| WO | WO 92 02891 | 2/1992 |

* cited by examiner

*Primary Examiner*—William A. Cuchlinski, Jr.

*Assistant Examiner*—Marthe Marc-Coleman

(74) *Attorney, Agent, or Firm*—D. Peter Hochberg; Katherine R. Vieyra; William H. Holt

(57) **ABSTRACT**

A method and device for generating, merging and updating data for use in a destination tracking system which comprises, among others, the following steps: Generation of data by mobile units (vehicles) to model reality concerning route(s) and traffic, and storing this data for further use. A highly up-to-date and extremely reliable database is built-up in a simple and efficient way by merging data from many units. This database makes it possible to answer a number of complex problems, for example, about the passable route network and realizable travel times. On input of an origin and a destination node together with the intended travel time, destination tracking data is calculated from the stored data. Since the origin-destination relationships of the motions carried out by the mobile units in dependency of all conceivable parameters are known, the destination tracking recommendations for each individual participant can be given such that the sum of the times of movement of all participants is minimized.

**53 Claims, 6 Drawing Sheets**



Case 1:12-cv-00528-TSE-IDD   Document 167-1   Filed 02/22/13   Page 3 of 80 PageID# 2551

**FIG—1**

Case 1:12-cv-00528-TSE-IDD   Document 167-1   Filed 02/22/13   Page 4 of 80 PageID# 2552



FIG–2



FIG−3



FIG−4

**U.S. Patent**      Mar. 12, 2002      Sheet 4 of 6      US 6,356,836 B1



FIG−5



FIG−6



FIG-7



FIG-8

**U.S. Patent**        Mar. 12, 2002        Sheet 6 of 6        US 6,356,836 B1



FIG−9



FIG−10

US 6,356,836 B1

**1**

# METHOD AND DEVICE FOR GENERATING, MERGING AND UPDATING OF DESTINATION TRACKING DATA

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

The invention relates to a method for generating and updating data for use in a destination-tracking system consisting of at least one mobile unit in accordance with claim 1 as well as a device for carrying this out in accordance with claim **38**.

### 2. Description of the Related Art Including Information Disclosed Under 37 CFR 1.97 and 1.98

Navigational or destination tracking systems have recently been attracting significant attention, particularly their application in motor vehicles. The purpose of such systems lies in guiding a driver to a target destination by electronic aids after the destination has been entered by the driver. Firstly, the route can be found accurately without tiresome questioning of third parties and secondly, congestion or other traffic obstructions can be avoided.

Typical navigational systems work by continuously analyzing the current location of a moving vehicle and comparing this position with a road network in the form of geographical data. This information can be read from a road map stored, for example, on a CD-ROM carried in the vehicle. From the geographical data and assumptions about achievable speeds, a computer determines a favorable way to a destination possibly or optionally taking into account additional specific road information such as reports of road works, accident reports, etc., transmitted by communication systems. The result is shown by means of a display, for example represented graphically in the form of a map, in which the location of the vehicle is indicated, e.g., by a point. On the basis of the map displayed together with the current location of the vehicle, the driver can follow the displayed route up to the destination node. Such a system or method is described, for example, in DE 35 12 127 A1.

Similarly, DE 38 28 725 A1 describes a method to record and store a route carried out for the first time with a facility installed in the subject vehicle. When making a new trip along the same route, this recorded information can be reused. This method is intended to simplify the requirements, described in DE 35 12 127 A1, of comparing the current location of the vehicle with stored geographical data for a route which is already known to the subject vehicle. DE 41 05 180 A1 describes an autonomous road guiding system for motor vehicles which contains a device to record the course of a street actually taken and stores the data in a storage unit. Impulses along the route are detected automatically, whereas changes of direction are entered by hand via the push-buttons of the device or via the direction indicator of the vehicle. The storage unit thus programmed can be taken out of the device and given to a third party thus making it possible for the third party to drive along an unknown route with the help of the storage unit. One of the problems of this autonomous road guiding system, among others, is that only quite specific road topologies can be saved and updates are not carried out. Thus neither changes in the road topology nor unexpected events between the programming of the storage unit and the trip of the third party are taken into account. Additional problems are encountered in the "calibration" of the geographical data.

In addition to the above, DE 40 08 460 A1 describes a method which takes into account the current traffic conditions when selecting a route. The current traffic condition

**2**

data is transmitted to the destination tracking device in the vehicle in the same way which makes it now possible for vehicles with radio sets to receive traffic news.

DE 43 34 886 A1 describes a destination tracking device for motor vehicles with an on-board computer which extracts and processes signals for a route to a given trip destination said to be optimal with regard to travel time and/or fuel consumption. The vehicle contains a facility which has collected and stored data on the time-dependent occurrence of traffic obstructions during at least one earlier information gathering trip. Said data are entered into an on-board computer and taken into account when determining a modified route. The well known destination tracking device mentioned above has the advantage that it is not dependent on external facilities such as radio traffic services or computers to record traffic hold-ups. However the data entered to identify traffic obstructions is seldom up to date. The geometric route section data, furthermore, is taken automatically from a CD-ROM and consequently is not always up to date.

U.S. Pat. No. 4,350,970 A1 describes a method for recording the travel time of a vehicle between two given nodes, and for transmitting said travel times to a computer designated as the master computer. Said master computer then compares the travel times with average values; if there are significant deviations, another route is proposed to subsequent vehicles. The transmitting vehicle does not receive the revised result. In other words it is a traffic control system and not a destination tracking system.

DE 195 26 148 C2 and DE 195 34 589 A1 describe methods as well as systems for forecasting traffic flows. The basic structure corresponds to the method and system discussed earlier in DE 35 12 127 A1. But in contrast to the method and system disclosed in DE **35 12 127** A1, the method and system described in DE 195 26 148 C2 successively stores the momentary vehicle speed and its current position which are continuously determined by means of a receiver tracking signals from a navigational satellite system, said receiver being located in a storage unit in each vehicle of a sampling fleet. The stored locations are part of the trip route data which are transmitted time-dependently and/or route-dependently by the sampling vehicle to a traffic control computer. Simultaneously "current trip activity data" from stationary sensors is also transmitted to the central computer. The central computer then analyses the transmitted route and trip activity data against a stored digital road map and determines the traffic volumes, i.e. the vehicles per time unit at a specific road cross section based on that route data. Subsequently, according to DE 195 34 589 A1, traffic development can be forecast by the central computer from the stored traffic volumes. It is reported that the central computer can propose "time-optimal" routes to other road users based on this forecast and its stored digital road maps. The title of DE 195 26 148 C2 not withstanding, traffic flows cannot be forecast by these known methods or systems since the most important information requirement, namely the start and destination nodes of the vehicles, are not known by the central computer. Furthermore, the corresponding linear equation system always exhibits an arbitrary degree of incorrectness.

The systems or methods described in DE 35 12 127 A1, DE 38 28 725 A1 , DE 40 08 460 A1, DE 195 26 148 C2 and DE 195 34 589 A1 have one thing in common, they all use a static database with regard to the geographical data. An exchange of the geographical data is carried out only from time to time. Even a short time after the geographical data of a certain region has been fed into the storage device of a

A74

US 6,356,836 B1

3

vehicle, it may no longer be up to date since, for instance, a route or link may be blocked, or newly opened, or the travel direction in a one-way street may have changed. Furthermore, these known systems or methods do not take into account the fact that the same route may exhibit different travel times at different times of day, traffic conditions, weather conditions, etc. Another inherent property of these conventional systems is that the destination is addressed by input of the name of the location together with the name of the road and, sometimes, a street number. If the destination node in this format is not known to the system it is impossible to calculate any route.

Furthermore, these known methods and systems are based on the hypothesis that the available road network is essentially known. In fact, however, the geographical data actually stored represents reality only incompletely, with the degree of incompleteness varying from region to region.

The effort necessary to maintain updated information on the accessible route network is both highly time consuming and costly. It is also not feasible to operate in all parts of the world with the same standard. Updating of data is always incomplete and prone to errors and can be carried out only after a significant delay in time. The updated data can be made available to the user only after a significant delay in time.

Since the known methods and systems only have subsets of the actual route network available, the route recommendations might involve considerable detours (with respect to length and time). If for example, an apparently unimportant part of the road network, particularly if it lies in the direct direction to the destination node, is unknown to the system, it may cause a significant delay to the vehicle requesting a route recommendation.

The effect of driving along detours can easily take on considerable significance considering that this fault applies to all mobile units.

BRIEF SUMMARY OF THE INVENTION

It is an object of the invention to establish a method to generate appropriate data utilizable for a practical destination tracking system which carries out a permanent self updating and with data generation which requires little effort. The method is also appropriate for deriving destination tracking data from the data generated in accordance with the aforesaid method.

It is another object of the invention to provide a device for carrying out the method described above.

As far as the method is concerned, the object of the invention is attained by the characteristics of claim 1. Additional advantages resulting from the method of the invention are specified in dependent claims 2 to 37.

The method of the invention is characterized by the fact that in a mobile unit, e.g. a motor vehicle, traveled distance data are generated and are used for automatically generating a digital route network which maps the sections of the route that the mobile unit has covered. This network information is then saved in a storage device. This route network is stored as a section data file which contains the individual route sections with their initial and end points. By means of the continuous extension and/or updating of the section data file with new section data generated for new sections traveled by the mobile unit, the route network corresponds, step by step, to the conditions of the real route network so that, at any point in time, there is a current route section network available to the mobile unit.

In addition to the geographical coordinates $x_i$, $y_i$, of the points $P_i$, the direction of movement $_i$ of the mobile unit

4

can be recorded when generating the traveled distance data. The direction of movement $_i$ can either be derived from the geographical coordinates $x_i$, $y_i$, of the points $P_i$ of the traveled distance data or be detected by means of at least one sensor unit provided for the mobile unit.

To avoid unnecessary overburdening the storage device provided in the mobile unit, additional provisions can be made to permit the generation of traveled distance data and/or section data to be interrupted if the newly generated data already exist in the storage device of the mobile unit, and to cause said generation to be restarted if the newly generated data have not yet been stored in the storage device of the mobile unit.

Since the section data file stored in the mobile unit is continuously extended and/or updated, a highly topical route recommendation can be presented, at any time, if so requested by entering a desired point of destination and possibly a starting point for the mobile unit into an input device contained therein, provided the mobile unit contains a data processing device. If the starting point is already known, it does not need to be entered. The suggested route is presented visually and/or acoustically.

The provision of at least one central computer, separate from the at least one mobile unit, as set out in claim 7, makes it possible to merge the section data files created by several mobile units into at least one overall route file which gives a complete view of the utilizable and used road network. In order to keep the required storage capacity of the central computer to a minimum, provisions can be made so that a central computer checks a section data file transmitted by a mobile unit for its update value before merging the new section data files and only merges those section data files which have been recognized as at least partially new into the overall route file. According to the characteristics of claim 9, it is possible to build up different overall route files for different types of mobile units, for example special files for cars, lorries, motorcycles, cars of various size or type of motor, etc. Other criteria, attached for example to the user of the mobile unit (age, sex, etc.), can also be taken into account for the construction of various types of overall route files. Such type specific files permit the selection of the most favorable route for each category of users.

According to the method of the invention, data collection is fully automatic. Collection of data can of course be switched off from within the mobile unit. If the individual participants are hesitant to have their personal data transmitted to a central computer, then according to claim 10, it may be advantageous to pay for data transmitted by participant to a central computer in order to achieve optimal data collection. The amount of the reimbursement fee can be determined in accordance with the update value of the data.

The communication between the mobile unit and a central computer can be achieved in various ways. The data recorded by the mobile unit can be transmitted to the central computer automatically upon reaching the end of a movement, for example defined as reaching the point of destination, or if requested by the central computer either periodically or in accordance with any other criterion. Given that a mobile unit is fitted with adequate devices, communication between a central computer and a mobile unit can occur alternatively automatically, after a given time period, or upon request by the mobile unit, as a function of the update value of the item of new information to be transmitted, or in accordance with other criteria.

Besides an optional processing device in the mobile unit, a central computer can also propose and transmit to a mobile

US 6,356,836 B1

**5**

unit, if so requested by said mobile unit specifying a starting point and a destination point, a proposed route on the basis of the at least one overall route file already stored in the central computer.

Frequently the existing section data file and/or overall route file does not contain the desired origin and/or destination point requested by the mobile unit. In such case, to compute a proposed route, it is recommended that an optional data processing device in the mobile unit or a central computer use the nearest known origin and/or destination point from the section data file stored in the mobile unit or from the at least one available overall route file stored in the central computer.

Known destination tracking systems or methods, in most cases, determine the requested destination node by inputting the town's name, the name of the street, and possibly the street number. However, if the destination node is given by its geographical coordinates, it is possible, as already discussed above, that an optional data processing unit in the mobile unit itself, or a the central computer can direct the mobile unit to a destination in close vicinity of the unknown destination node, by using known coordinates and their corresponding streets and/or street numbers. Any available (geophysical) system of coordinates can be used for this purpose.

Since the input of coordinates is difficult for the average user of such navigational systems or methods, the provision of a bar code reader as an input device to read the coordinates could facilitate the entry of data. A voice input is also possible.

In this connection, it should be noted that the destination point need not be specified by its geographical location alone but also by additional characteristics. Thus the method of the invention can also be used, e.g., to find routes to supermarkets, exhibitions, amusement parks, etc., and, for example, even a specific exhibition stand on the ground of a trade fair could be found. It goes without saying that destination data can also be merged with additional data from other information systems, e.g. informative data about the destination such as hotel data, public transport time tables, speed limits, etc.

A further measure to reduce the requirements of storage capacity in the mobile unit or a central computer is described in claim **20**, according to which the generation of traveled distance data of the mobile unit is only activated if the mobile unit does not take the route suggested by a central computer or by the data processing device in the mobile unit itself. Additionally, provision can be made to interrupt the generation of traveled distance data if the trip is interrupted.

Besides the provision explained above for recording geographical coordinates $x_i$, $y_i$, of the points $P_i$ of the traveled distance data, the point in time $T_i$ when points $P_i$ are reached can also be recorded and stored in the storage device of the mobile unit. Furthermore, provision can be made to assign the absolute time of movement $T_{jk}$ to the sections $P_jP_k$ traveled. Also the actual duration of travel $t_{jk}$ can be assigned to the sections $P_jP_k$. By this means, the realized travel time for each individual section can be taken into account in the planning of a route. This procedure is superior to that of known technologies which assign the average speeds reached by a traffic flow on a route section or calculate travel time on the basis of the momentary speed of a sample vehicle, since using speeds to determine a recommended route with a view to obtain the shortest travel time is inadequate both at the microscopic (one mobile unit) and the macroscopic level. Using recorded speeds (the quotient of distance

**6**

and time) to calculate the required travel time for a route section is fundamentally inaccurate since the speed is constantly changing.

A description follows below on how the additional data mentioned above permit to build up a section data file and/or an overall route file, which takes into account the patterns of movement at various times on the same route sections. For the purpose of data compression and the production of data which are as meaningful as possible, the points of time $T_i$ can be used to merge the section data for those calendar times which exhibit a similar typical movement pattern or traffic activity. This then can be taken into account in the planning of routes.

In addition, it has proven to be advantageous, if the same geographical sections, when covered during different trips of the mobile units in predetermined time periods resulting in the duration of movement $t_{jk}$, are combined in the section data file so that, for instance, the durations of movement $t_{jk}$, are combined in the section data file so that, for instance, the durations of movement $t_{jk}$ required for a given section at a given hour on the first Monday of a given month can be fetched. Average values can be calculated from the durations of movement $t_{jk}$.

The characteristics of claim **28** mean that it is possible to forecast the realizable duration of motion for a typical pattern of movement provided that no special or unusual events, such as accidents, floods, building works, etc., are present.

In determining the pure duration of motion $t_{jk}$, it may be advantageous to suppress the idle time of the mobile unit during the collection of data.

claim **30** gives an example where similar traffic conditions occur during recurrent calendar periods. Generally it can be stated that traffic activity fluctuates periodically so that there are similar calendar times regarding the traffic activity, e.g., Monday morning, Friday afternoon, the start of holiday, etc. The features of claim **31** achieve the advantage that, in addition to the section data collected over a long period of time and evaluated statistically, the most recent section data are stored in a short-term section data file so that it is possible to recognize when a special event, such as a particularly slow travel speed caused by a building works, or an accident, or if the current section is part of a one-way road, etc., is present. The nodes $P_jP_k$ of a route section $P_j$, $P_k$ can be fixed in many different ways. They can, for example, be fixed according to the occurrence of changes of direction or because they lie at the intersection points of sections of different direction.

In order, for example, to be able to obtain further information about petrol/gas stations for mobile units, provision can be made to store additional information, such as the idle time intervals of the mobile units, in the section data. claim **36** characterizes the fundamental execution of the method for the solution of the second part of the purpose of the invention. For example, the section file, which models the total traffic activity, permits to calculate, reliably and with a high level of topicality, a route from a given starting point to a given point of destination, thus minimizing the duration of motion or the length of the route.

The features of claim **37** make additional improvements to the precision of the method in generating destination tracking data. generating destination tracking data.

The computer cited in claims **36** and **37** could either be a data processing device in the mobile unit or a central computer.

Concerning the device and/or the system, the above object of generating data usable for a destination tracking system is

US 6,356,836 B1

7

attained using the characteristics of claim **38**. Claims **39** to **52** describe advantageous embodiments of the device of the invention. The device of the invention has the same advantages which have been previously explained in the description of the method of the invention.

To facilitate inputting address information, an input device can be provided that reads address information from a data storage medium. This data carrier can, for example, be a visiting card containing the address information. Said facility can also be a bar code reading device or a speech input device.

It should be noted that the term "mobile unit" covers not only vehicles but also, for example, pedestrians who are equipped with a portable navigational system in accordance with the invention. Such a system could be advantageous, for example, to a pedestrian, if the names of roads in a city are not available or if the names are written in characters which are not decipherable by the user of the system.

If the mobile unit is a motor driven mobile unit such as a motor car, then the evaluation of the recorded basic data can be improved if the recording unit also includes means for registering the motor revolutions and the fill level of the storage unit for the energy utilized by the engine of the mobile unit, in particular the petrol tank, and for recording the temperature and/or humidity, etc. The accuracy of the evaluation of the data can be further improved by these means since the motor revolutions can be used as an indication of how often the vehicle had to halt at traffic lights and the level of the tank contents can be used to determine where a suitable petrol station is available since the tank's state between empty and full is recorded.

A gyrometer or a compass can be provided to register the direction of movement of the mobile unit. The device for recording the respective absolute position might also be a GPS receiver. In order to reduce the amounts of data required by a central processing unit for the fulfillment of its tasks, it can be advantageous to connect several regional stationary central computers in a network instead of installing a single stationary central computer.

Summarizing, the travel destination tracking data can be calculated from the overall route file after the input of both origin and destination nodes as well as the intended travel time. Since all origin-destination relationships of the traffic or the actual movements of the mobile units in relationship to all possible parameters are known, it is possible to give destination route recommendations for all traffic participants in such a way that the sum of time for the movements of all participants is minimal.

Further advantageous embodiments as well as a demonstration by example are explained below with reference to the following figures:

BRIEF DESCRIPTION OF SEVERAL VIEWS OF THE DRAWINGS

FIG. **1** is a block diagram of an on-board system in accordance with the invention for a vehicle operating as a mobile unit;

FIG. **2** is a block diagram of a computer which communicates with the system in accordance with FIG. **1**;

FIG. **3** is a schematic representation of a road network with nodes **1** to **16** representing road intersections with the lines connecting the nodes representing roads;

FIG. **4** is a schematic representation of the network of FIG. **3** showing two possible routes between points **1** and **16**;

FIG. **5** is a schematic representation of a known road network with a destination point Z outside the network;

8

FIG. **6** is a schematic representation of the road network of FIG. **5** after the destination Z has been reached;

FIG. **7** is a schematic representation of the network of FIG. **6** with the addition of a starting node S to the known network;

FIG. **8** is a schematic representation of the network of FIG. **7** with the addition of the connection of node **18** to node **2**;

FIG. **9** is a schematic representation of the network of FIG. **8** with the addition of an intermediate node **19** outside the network; and

FIG. **10** is the schematic representation of a final network after a mobile unit has traveled a route including nodes **18**, **19** and **17**.

DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates the destination tracking system in accordance with the invention with its two essential assemblies. The destination tracking system can be installed in a vehicle operating as a mobile unit. In FIG. **1**, the inputs of an electronic control device, or electronic unit, designated as a whole with reference number **2** are connected to the sensors, or signaling devices, mentioned below.

A navigational GPS (global positioning system) receiver **4** produces data which give the geographical position of the control device **2** of the mobile unit by, for instance, geographical latitude and longitude. Optionally, the altitude can also be given.

A compass **6** containing, for example, two cross coils reads the geomagnetic field. The compass, which is compensated with regard to any magnetic declination due to the control device **2** or the vehicle, produces a signal which corresponds to the direction of the mobile unit or the vehicle relative to the magnetic north. The compass **6** can be supplemented or replaced by a gyroscope which delivers a more exact value of the direction because of its gyrostabilization.

A mileometer **8** generates an impulse for each unit of distance covered. This can be done, for example, by reading the revolutions of the vehicle's wheels. Unit **10** is a clock which generates a signal corresponding to the absolute time.

A vehicle signal generator **12** generates a signal specific to each vehicle type. This device is permanently programmed upon installation in the vehicle. An event generator **14** generates a specific signal corresponding to the occurrence of a specific event: i.e. opening and/or closing a door; refueling (opening the petrol tank cap, changing the fuel level); vehicle maintenance (resetting the maintenance interval monitoring system); rain (continuous use of the wipers); frost (low outside temperature); etc. It is understood that additional signaling devices can be made available to record, for instance, fine weather (sunshine), the load under which the engine runs, the weight of the vehicle, the axle loads, etc. In particular, measuring the axle loading is a very simple but most effective method for calculating the stress on the road surface at a road cross section by summing the axle crossings or the normalized axle crossings. The data, when made available to a central computer, can be evaluated to determine the point in time when the road surface requires renewal.

The control device **2** also contains an interface **20** to convert the output signals of devices **4** to **14** into digital signals that are then processed within device **2**; a microprocessor **22** executing several different computational pro-

US 6,356,836 B1

**9**

cedures; a ROM 24, which, among other things, contains the working programs for the micro processor 22; and a RAM 26 with direct access into which the information and current data required to execute the programs are written and from which said information is read out.

An input unit 28 is provided to feed the control device 2 with data. An output or display unit 30 can output information acoustically and/or optically. A data input/output device 32 is provided so that the control device 2 can transmit data to and receive data from a remote central computer. The data input-output device 32 can send or receive data directly or by modem. It can also contain a portable data carrier, by means of which data can be read or written into another location, for example by means of a personal computer (PC). Data can also be inputted and outputted via sensors built into the mobile units and communicating with stationary sensor devices located, for example, in parking lots, petrol stations, etc., said sensors operating either ultrasonically, in the infrared spectrum, or any other non-contact or wireless method.

The data which is derived from signals generated by the devices 4 to 14 are evaluated and stored in a trip storage unit or motion storage unit 40, respectively, a section data storage unit 42, a section data file storage unit 44, a short-term storage unit 46 and an event storage unit 48. The function and the contents of the storage units named above are explained in detail below.

The storage units named above are connected by a data bus 50. The construction of these units is well known and does not need to be further described here.

FIG. 2 shows the circuit diagram of the central computer 62, which has many components which are similar to those of the control device 2 with which it communicates directly or indirectly over a transmission device 64. In the total system, several central computers connected in a network can be assigned different tasks.

The central computer 62 contains a microprocessor 66 with a ROM 68, and a RAM 70, an overall route file storage unit 72, a short-term storage unit 74, and an event storage unit 76. An input/output device 78 transmits data to and from the central computer 62. The construction of all of these constituent units, connected over a data bus 80, is well known.

A typical working sequence of the devices described above is outlined below: When a vehicle representing a mobile unit and equipped with the system corresponding to FIG. 1, activated via input unit 28, is started, the GPS receiver 4 sends a signal which identifies the location of the vehicle, compass 6 sends a direction signal , and clock 10 sends a time signal t. These three signals are combined, in the trip storage unit 40, to a first traveled distance data $P_i$ comprising the geographical coordinates $x_i$, $y_i$ of the starting point $P_i$ and the absolute time $T_i$. The subsequent points $P_{i+1}, \ldots, P_{i+n}$ are stored in the same manner according to a prescribed routine, for example, after a given time interval given by the clock 10 or after a certain distance has been covered as given by the mileometer 8. The location coordinates x and y are compared for plausibility with the subsequent points calculated on the basis of the direction signal and the time signal t, and any deviations are averaged. Thus the route covered is recorded by a series of points. The point records can be supplemented by data generated by the vehicle type signal unit 12, said data way include vehicle model and type, motorization, or similar information mentioned above. If the event generator 14 produces a signal, e.g. a refueling signal, this signal is stored as an event signal

**10**

E, in the event storage unit 48 together with the location $x_i$, $y_i$ and the time $T_i$. If the vehicle is not moving and this stationary period matches an event such as opening and/or closing a door, refueling, etc., then this is judged to be an interruption of the trip. The points of a first route ending before the event and of the further route traveled subsequent to the event are stored in the trip storage unit 40.

After completion of a trip or even during the trip, section data are generated from the traveled distance or route data stored in the trip storage unit 40, compressing the traveled distance data by dropping individual points $P_i$ and choosing those points $P_j$ and $P_k$ which are most by dropping individual points $P_i$ and choosing those points $P_j$ and $P_k$ which are most characteristic in defining a section of the route. For example, characteristic route nodes $P_j$ and $P_k$ are nodes where the vehicle direction $i$ changes by more than a given predetermined value, or nodes at the intersection of sections oriented in different directions, or nodes that are otherwise conspicuous. The sections $P_jP_k$ calculated from the route nodes $P_i$ stored in the trip store are saved in the section data storage unit 42 in the following manner:

$P_jP_k = x_j$, $y_j$, $x_k$, $y_k$, $t_{jk}$, and $T_{jk}$, where x and y represent the geographical coordinates, $t_{jk}$ is the time required to move between the points j and k and $T_{jk}$ is the absolute time of the trip along the section $P_jP_k$ . Thus a large number of section data $P_jP_k$ are saved in the section data storage unit 42, said section data being compacted in comparison to the total number of nodes $P_i$ passed on the trip since at least some of the sections include more than two nodes $P_i$.

The numerous trips carried out by a vehicle, whereby the same section is normally traveled several times, are further compressed in the section data file storage unit 44. In the section data file storage unit, the absolute time is divided into a number of fields $A_t$ relating to specific traffic conditions. Each $A_t$ stands for a specific time period, for instance, a particular day in a given month, i.e. it defines a traffic relevant time period. Traffic relevant time periods are, for example, periods when particularly strong rush-hour traffic occurs every Monday morning or, in states which celebrate Christmas from December 24th to 26th, periods when especially heavy long distance holiday traffic occurs each year on December 27th on certain routes. The Thursday before Easter is an example of a holiday not connected to a fixed date which is linked to special traffic conditions. Based on the durations $t_{jk}$ and the absolute times $T_{jk}$, during which certain sections $P_jP_k$ are traveled, a check routine of the microprocessor 22 can independently determine characteristic periodicities or events and define corresponding traffic relevant time periods $A_t$.

The sections $P_jP_k$ with the corresponding durations $t_{jk}$ and the frequency distribution h ($t_{jk}$) are saved in the section data file storage unit. Thus the section data file storage unit contains a section data file which in turn contains the expected time $t_{jk}$ required to traverse a section $P_jP_k$ grouped by traffic relevant time periods $A_t$.

The more section data are assigned to a traffic relevant time period in the section data file storage unit, the more significant is the expected trip time in normal traffic conditions. This precision seems useless if a sudden event changes the traversability of a section $P_jP_k$. In order to take into account such special cases, the section data from the section data storage unit 42 are stored in the short-term storage unit 46 for a short period of time, for example the last 24 hours.

The events $E_t$ reported by the event generator 14 are saved in the event storage unit 48 together with the coordinates $x_i$, $y_i$, and the point in time $T_i$ at which the event occurred. In

US 6,356,836 B1

**11**

this way, all trips carried out by the respective vehicle are saved in the control device 2 in the form of sections together with the associated trip time and the traffic relevant points in time. It is self evident that the geometric data of the sections, in so far as they are not new, are not re-recorded on each trip. Thus usually only the duration of the trip and the absolute time and/or the traffic relevant point in time are registered. The user can, of course, switch off the recording and/or transmission of data at any time.

In order to merge the trips of a large number of vehicles and thus achieve an even more significant and extensive coverage of data, the data saved in the storage units 44, 46, and 48 of the specific control device 2 of the vehicle are transmitted, either automatically after a given period, or on request by entry in the unit 28, by the data input/output device 32 to the central computer 62. This data transmission can be either a wireless transmission from the vehicle, by cable using a data carrier taken from the vehicle, or in any other way. Thus it can take place during the trip, or when the vehicle stops, i.e. in a car park, garage, filling station etc. Data transmission can be triggered automatically after a given period, or coverage of a certain distance, depending on the update value of the data, or on request from a central computer, or in some other way. The data from different vehicles is merged in the section data file storage unit 72, the short-term storage unit 74, and the event storage unit 76 and saved, if required, in accordance with the specific vehicle class (vehicle signal generator 12). If, on data transmission to the central computer 62, additional vehicle identification data (vehicle signal generator 12) is delivered, the central computer 62 can evaluate the information content and/or the update value of the transmitted data and transfer a corresponding credit note to the sending vehicle. Alternatively, a toll account can also be carried out by the central computer.

Ensuring that the one (or more) central computer(s) of the system have continuous full coverage of relevant data is achieved as follows: The computer of every vehicle recognizes the update value of the data which it has just determined with regard to the geometric contents (traveled distances) and time contents (trip times). This update value (e.g. the amount of new data) is offered to the central computer together with a geographical specification (e.g. the geographic center). If the central computer requests the data, then a credit note is promised if the data is sent immediately.

A central computer makes a direct inquiry to vehicles currently in areas for which a data requirement exist. A central computer knows the locations of the vehicles because of their past requests for data or data transmission. A central computer can alternatively request vehicles in the area of interest directly by sending the geometric data of the target area. The vehicles then compare the transmitted data with their own location data.

A continuously updated file, more or less condensed, depending on the evaluation procedure, is built up in the central computer 62, and represents the complete traffic activity within the area covered. This information can be evaluated for highly specific tasks by planning authorities, maintenance authorities, etc. Since the data is very comprehensive and up to date it can be used for problems such as green wave traffic signals, one-way traffic, etc. The control of green wave traffic systems require a detailed knowledge of the location of traffic lights, signal time plans, and of the relevant traffic flows. All of this information is contained in merged data received from individual vehicles. Given knowledge of traffic light location and time phases, the individual vehicle can receive a recommendation on speed so that the probability of a stop free journey is maximized.

**12**

The entire system requires no infrastructure such as signal coils in the streets, central storage of the road network for example in CD-ROM, collection of traffic statistics, etc., although the use of a CD-ROM as an initial data set is not excluded. The above description deals with the system as far as it is used to generate data via signaling units 4 to 14 contained in individual vehicles (see FIG. 1), which data can be used for a destination tracking system.

The following description explains the use of the system for deriving tracking data from the generated data.

It is assumed that the driver of a vehicle wants to make a trip from a location A to B on a third Monday morning in September, the route leading mostly through rural areas.

The desired trip is entered into the input unit 28 by reading, for instance, a visiting card containing the origin node A and a further visiting card containing the destination node B, both visiting cards containing the geographical information in the form of bar-codes. It is understood that a numeric input or a voice input of the locations of origin and destination are possible alternatives. It is advantageous to enter the origin and/or destination node by means of coordinates since this also permits to enter destinations for which either a postal code or similar address is not available or not known to the system. A further advantage in addressing destinations by coordinates is that the system is able to direct the user to the closest identifiable point, if a desired destination entered is not identifiable.

Since the intended trip is a route which the vehicle does not usually utilize, it is probable that no relevant information is available in the storage units 40 to 48. Thus the input unit 28 will request a central computer for relevant data for the desired trip, e.g. entering the desired trip into the central computer 62 which either calculates a route and sends back the resulting route data set, or just sends all relevant data concerning the areas of origin and destination to the control device 2 which will calculate the route. In both cases the data transmission is charged to the requesting vehicle by the central computer 62. This means that the request is only answered if specific vehicle data or a code identifying either the individual vehicle or the driver has been entered. The full route is put together from the individual section $P_jP_k$ by using a well known optimization algorithm operating on the basis of the data in the section data file 72 or the updated section data file 44 in such a way that, in the case where the trip takes place mostly in rural areas, the distance traveled is minimized. If the trip is mainly through municipal areas or, on express request by the driver, an optimization algorithm which minimizes the total duration of travel time can be chosen. Other possible optimization criteria can be given, i.e. avoidance of road tolls or mountain passes, or minimization of fuel consumption, etc.

The recommended individual route sections are compared with the section data already stored in the short-term storage units 46 or 74. The data of the short-term storage units may suggest that the travel time expected under normal traffic conditions or normal state cannot be realized on a recommended route section. The display unit 30 shows the trip route made up of the individual sections together with the expected duration or arrival time. As the route is traveled the individual sections are identified so that route tips can be given continuously and the location of the vehicle can be shown on a map. Deviations between the route actually driven and the planned route can be corrected by the computer in the vehicle by calculating and displaying an updated route recommendation.

In addition, the event storage unit 48 can be used if, for instance, it is necessary to refuel by requesting the location

US 6,356,836 B1

13

of a petrol station in the relevant area. Alternatively, referral to an open petrol station can be automatic and navigational help to find the station can be given.

As demonstrated above, the invention creates a system using modern sensor, computer, and storage technology to enable the optimal use of the available highway or route network, respectively, and to achieve predictable travel times, even in high traffic densities, by optimizing the route.

The procedure for updating and merging data corresponding to the invention's method is described below with reference to FIG. 3 to 10.

FIG. 3 shows a known route or road geometry in which the nodes 1 to 16 represent road intersections and the links between these nodes represent roads. This known road geometry can be stored either in the overall route file storage unit 72 of the central computer 62 and/or in the central data file storage units 44 installed in the mobile units or vehicles.

On the basis of this known route geometry or traversable road network, various cases will be described below.

In the first case, referring to FIG. 4 and based on the given route geometry shown in FIG. 3, it is assumed that a first mobile unit, a motor vehicle for example, wishes to drive from the origin S, which lies at node 1, to a destination node Z which lies on node 16 of the given route geometry. Thus both the origin S and the destination Z are known. The central computer 62 or the optional data processing unit or microprocessor of the mobile unit recommend a route calculated on the basis of the existing data material, i.e. the road geometry according to FIG. 3, taking into account travel times from a possible earlier trip of the same mobile unit or that of another mobile unit between the nodes S and Z. The recommended route S→2→6→7→8→12→Z is represented by "x" in FIG. 4.

During the trip microprocessor 22 checks whether the mobile unit is moving along the recommended route. It does so by using sensor 4 to determine the location (i.e. GPS Receiver 4 in FIG. 1) and sensor 6 to determine the direction of motion of the mobile unit (i.e. compass 6 in FIG. 1). Since the route is known it is not recorded again.

On the other hand, however, the travel time, i.e. the time of motion, of the first mobile unit is recorded. The pure travel time, i.e. the time of motion of the mobile unit, and the total travel time, i.e. the difference between departure time of the mobile unit at the origin S and arrival time at the destination Z, can vary due to stops at traffic lights, building works, etc. The distinction between the condition "motion of the mobile unit" and the condition "mobile unit is stationary" can be determined, for example, by means of an appropriate sensor, attached to a wheel or a shaft of the mobile unit, to measure or count rotations. If an additional sensor is provided to measure the fill state of the fuel tank of the mobile unit, the state "mobile unit is stationary while purchasing fuel" can be recorded and used when determining the total travel time. It is also possible to record the location of a petrol station, if this is not yet known, and transmit this information to the central computer 62, along with the rest of the data transmitted by the mobile unit so that this location information can be made available to other mobile units on the same route or in the same area. Upon reaching the destination Z or after a predetermined time period, the transmission device, i.e. the data input/output unit 32 in FIG. 1, transmits the data recorded by the first mobile unit during motion from the intermediate storage units 44, 46 and 48. This can be the pure travel time, the total travel time, the start time of the mobile unit, the weekday, the location of a petrol station, etc. If the first mobile unit is

14

provided with the optional CPU 22, then this data can be processed before being transmitted.

Data is received by the central computer 62 over its transceiver device, i.e. the transceiver unit 64 in FIG. 2, and processed and evaluated by the CPU 66 of a central computer before being saved in the overall route file storage unit 72 in accordance with the route taken between the origin S and the destination Z, the weekday and start time as well as being scored with the pure travel time and/or the total travel time. Insofar as trip times for alternative routes from the origin S to the destination Z in FIG. 4 are not yet known, if another mobile unit wishes to travel along the same route or has the same origin node and destination node, the central computer 62 or the CPU 22 of the mobile unit will, upon transmission of said available data by the central computer 62 to the CPU 22 of said mobile unit, will recommend the route S→2→6→7→8→12→Z, since this route is the only one which has been recorded earlier with a realized trip time.

The case can now be considered where a second mobile unit, or the first mobile unit described above, makes the same trip between the origin node S and the destination node Z in FIG. 4. However, in this case, the mobile unit needs to travel over node 9 (for example because the driver of this mobile unit has to take care of some task on the road section between points 5 and 9 or between points 9 and 10). In such case it is possible to enter this constraint together with the input of the destination. The central computer 62 or the optional CPU 22 of the mobile unit takes into account the constraint and recommends the route S→5→9→10→11→15→Z. This route is marked with "o" in FIG. 4.

The absolute starting time of the trip of the mobile unit is again determined and saved. Once again the pure travel time along each section is recorded together with the total travel time. Since the recommended route is a component of the known road geometry, no recording of road geometry is carried out. Only the location and the direction of motion are checked by the corresponding sensors 4 and 6 to ensure that the mobile unit actually moves along the suggested route. Recorded data is sent by the transmission device 32 to the central computer 62 at the end of the journey or after a predetermined time period. The central computer stores the transmitted data as outlined previously and scores it with the pure travel time and/or total travel time. With regard to the evaluation criterion "shortest travel time", the individual routes are immediately comparable provided that the journey of the second mobile unit has been executed at the same time of day, and on the same weekday, as that of the first mobile unit. Assume that the route S→2→6→7→8→12→Z has a shorter travel time ("pure" travel time or total travel time) than the route S→5→9→10→11→15→Z, perhaps because the traffic light switching of the second route mentioned is more unfavorable or because the volume of traffic is higher on this route than on the first one. In such case, either the central computer 62 takes into account this result to send the assumed travel time for a recommended route to a mobile unit or it sends the evaluated result to the CPU 22 of the mobile unit, which can then take into account the information independently. Thus a mobile unit making the trip from the origin node S to the destination node Z in FIG. 4 on a specific weekday at a specific time of day, on the basis of this evaluated result, can drive along the route with the minimum time.

It is self evident that on repeating this procedure with a large number of mobile units within the framework of the road geometry, as shown in FIG. 3, favorable routes for other times of day and weekdays can be determined. It

US 6,356,836 B1

15

should be noted, in this context, that the storage of routes together with the trip times could be done by storing the route as a whole or by storing the individual route segments and their corresponding realized travel times. A substantially higher storage capacity is needed for the last-mentioned method, but a far greater flexibility is reached since a disturbance prolonging the travel time within a route does not require the recalculation of a complete route but possibly only the recalculation of the one segment which needs to be replaced. This case is explained below in detail.

In determining an optimal route with respect to travel time, the situation can arise where a particular route is favorable on a specific weekday at a specific time of day, but unfavorable at another time of day and/or weekday. Furthermore, it is self-evident that the significance and reliability of route recommendations increase with the number of trips made by mobile units in the road network depicted by FIG. 3. Thus, for a time-optimal route between the origin S and the destination Z, highly differentiated route recommendations may be made for different times of the day and days of the week.

Changes to the road geometry can also be taken into account. For example, Suppose that road work is commenced on the route S→2→6→7→8→12→Z between the points 6 and 7 which results in traffic congestion. The method in accordance with the invention takes into account this event by recording an increase in the travel time on the route. Said increase in travel time would be transmitted to the central computer at the end of the trip. After a certain total number of measured travel times, said number of samples being freely selectable as a function of the desired stability of the result, the route would be newly evaluated by the central computer 62. Thus, in recommending a route, the new evaluation would be taken into consideration by the central computer 62 or an optional CPU 22 of a mobile unit, either by calculating a completely new route (e.g. the route S→5→9→10→11→15→Z), or by making a modification to the first route recommendation so that the route would now run: S→2→6→10→11→2→Z.

The destination tracking system or method in accordance with the invention is not only able to determine a minimal time route from several possible routes, depending on the time of day, day of week, etc., for a given road geometry and to update the route recommendations continuously but also to update the road geometry. This capability is explained below.

It is assumed that a third mobile unit also wants to travel from the origin S to the destination Z, with the road geometry of FIG. 3 and FIG. 4 being known. The mobile unit, however, actually takes the route S→6→11→Z, shown in FIG. 4 by the dotted line, due to the knowledge of the user. During this trip, the new road geometry will be recorded by the mobile unit, in particular by means of sensors 4 and 6 which detect the position and the direction of motion of the mobile unit, and this information will then be transmitted to the central computer 62 at the end of the journey or after a predetermined time period. The central computer 62 can now update its data stock with regard to the road geometry and also inform the CPU 22 of the mobile units. In recording this, until now, unknown route, the travel time is also recorded so that this route or its individual segments can be evaluated with regard to the travel time and possibly recommended as a time optimal route.

A further case corresponding to FIG. 5 is examined below. It is assumed that a mobile unit moves from the origin node S, which corresponds to node 1, to a destination node Z

16

outside the known road geometry and thus unknown to the navigational system. On the basis of the given road geometry, the central computer 62 or the optional CPU 22 of the mobile unit is unable to find a route to a node Z outside the known road geometry. However, upon entry of the coordinates of said destination node Z, the central computer 62 or the optional CPU 22 can identify node 16 as the point nearest to the unknown node Z. Thus a route recommendation is made which brings the mobile unit to a node directly in the neighborhood of the node Z. This route might be S→6→11→16. This is possible as the new route found in connection with the case depicted in FIG. 4 is now known after merging the data representing the corresponding road geometry. The mobile unit must now drive independently from node 16 to the destination Z. This new path from node 16 to destination Z is recorded and at least the new section is sent to the central computer 62 at the end of the trip or after a predetermined period of time. The central computer thus expands its data set. FIG. 6 shows the road geometry known after such trip. The newly introduced node is labeled as 17.

Even though the user of the mobile unit would have to find the link or destination node without the aid of the system according to the invention, the system will, with a high degree of probability, be able to lead the mobile unit back, e.g. to the starting point, due to the recording of the road geometry.

FIG. 7 depicts a case analogous to the previous case, but where the destination node Z is known while the origin node S is unknown. The mobile unit commences its trip, at first without a recommended route, until it reaches a node that is known to the central computer 62 or its optional CPU 22. In the present case this is the node 2. It could just as well have been any other node such as 1, 3, 4, 5 or 9, etc. The route from the origin node S to the point 2 is recorded together with the travel time. On reaching node 2, the central computer 62 or the optional CPU 22 of the mobile unit is now able to recommend a route based on the current updated database after merging the data resulting from the examples in FIG. 5 and FIG. 6. This route could be the route 2→3→7→11→16→Z. However, since the driver of the mobile unit knows that a direct geometric connection exists between nodes 2 and 7, he can take advantage of such knowledge when driving to node 7. The mobile unit records this new link in addition to the section already traversed by the mobile unit between the origin node S and node 2. The mobile unit then turns off the recording of road geometry after reaching node 7 since it is traversing known route sections. However, determining and recording of travel times and/or of the absolute times to reach a node are continued. The newly recorded road sections are transmitted to the central computer 62 either at the end of the trip or after a predetermined time period. The central computer evaluates the sections as to the trip times and stores them. The new road intersection is labeled as 18 in FIG. 8, which now reflects the new known road geometry.

This updated road geometry can now be provided to all mobile units either automatically or on demand.

A final case is shown in FIG. 9. The location of the origin node S and the destination node Z are known. However, on his way to the destination node Z (i.e. node 17), the driver of the mobile unit wishes to visit node 19 which lies outside the known road geometry. Since the connection between the origin node S (node 18) and node 2 is known to the central computer 62 or the optional CPU 22 of the mobile unit from the case described with reference to FIG. 7 and FIG. 8, and, due to the entry of the coordinates of destination node 19, the

US 6,356,836 B1

17

system components 62 and/or 22 also know that node 13 of the known road geometry is the point closest to node 19, and the recommended route might be S->2->6->10->9->13. The driver must find his own route from node 13 to node 19 and back to node 13 or look for a new route, possibly over node 14, or a direct route to the destination node Z. It is assumed that the driver of the mobile unit is looking for a direct route to the destination node Z and it is also assumed that a direct route between the origin node S (node 18) and node 1 is known to the driver of the mobile unit. The route between the origin node S and node 1, between node 13 and node 19, as well as between nodes 19 and Z is recorded by the mobile unit and transmitted to the central computer 62 as described above. The transmitted data is evaluated as before and made available to the mobile units. FIG. 10 represents the now known road geometry obtained by merging the data.

In contrast to known destination tracking methods or systems, the method or system according to the invention continuously revises data with respect to the traversable network sections as well as realized and realizable trip times or times of motion, to calculate minimal time routes between two arbitrary nodes. This is achieved by merging new data on links and traffic conditions that model reality into the system's storage units. Furthermore, the system or method according to the invention, being based on the use of coordinates, can lead a mobile unit to a node close to the desired location even when this location is not accessible on the basis of the road geometry known to the system.

In conclusion, it is taken for granted that the term "mobile unit" can apply to any type of vehicle as well as to pedestrians who are equipped with a portable appliance which exhibits the same constructional features as those discussed above.

What is claimed is:

1. A method for generating and updating data for use in a destination tracking system of at least one mobile unit comprising:

generating and storing traveled distance data in at least one storage device provided in said mobile unit at least at predetermined time intervals, wherein the traveled distance data represent traveled sections by at least a series of nodes $P_i$ and to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned;

generating and storing section data in the storage device provided in the mobile unit, said section data being generated by selecting, from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$, to which at least their geographical starting point and end point are assigned; and

generating a section data file from the section data and storing the section data file in the storage device provided in the mobile unit, said section data file being continuously supplemented and/or updated with section data newly generated by the mobile unit.

2. The method according to claim 1, further comprising the steps of measuring and recording as section data a direction of motion $_i$ of the mobile unit, in addition to measuring and recording the geographical coordinates $x_i$, $y_i$ of the nodes $P_i$ of the traveled distance data.

3. The method according to claim 2, further comprising the step of deriving the direction of motion $_i$ from the geographical coordinates $x_i$, $y_i$ of the nodes $P_i$ of the traveled distance data.

4. The method according to claim 2, further comprising the step of detecting the direction of movement $_i$ by means of at least one sensor provided in the mobile unit.

18

5. The method according to claim 1, further comprising the steps of interrupting the generation of section data in the mobile unit if the section data being generated are already stored in the storage device of the mobile unit and restarting the generation of data if the section data are not yet stored in the storage device of the mobile unit.

6. The method according to claim 1, further comprising the steps of preparing, via a data-processing device provided in the mobile unit, if requested by inputting at least a destination point into an input device provided in the mobile unit, a recommended route from a route data file already available in the storage device of the mobile unit, and representing said recommended route visually and/or acoustically in the mobile unit.

7. The method according to claim 6, further comprising the steps of utilizing, in the event either or both of the starting point and destination point are unknown, the data processing unit provided in the mobile unit or a central computer for processing either or both of the nearest known starting point and/or destination point from the section data file stored in the mobile unit or from the at least one overall route file stored in the central computer to calculate a recommended route.

8. The method according to claim 6, further comprising the step of using coordinates to specify the starting point, the destination point, and/or another point lying between the starting point and the destination point.

9. The method according to claim 8, wherein the coordinates are represented by a bar-code.

10. The method according to claim 6, further comprising the step of restarting the generation of the traveled distance data by the mobile unit when the mobile unit takes a route not recommended by a central computer or by a data-processing device of the mobile unit.

11. The method according to claim 1, further comprising the steps of transmitting the section data files of more than one mobile unit to at least one central computer located in a location remote from said at least one mobile unit and having said central computer merge said section data files at least at predetermined time intervals into at least one overall route file.

12. The method according to claim 11, further comprising the steps of having said central computer check the file transmitted by a mobile unit for its update value before merging said file with the section data files and only merging said file with an overall route file if said file contains at least partially new information.

13. The method according to claim 11, further comprising the steps of adding a characteristic classifying each mobile unit to the files transmitted by said mobile unit, and generating via a central computer different overall route files corresponding to the different characteristics.

14. The method according to claim 11, further comprising the steps of adding an identification code identifying the mobile unit to the data transmitted by the mobile units and detecting, via a central computer, the update value of the data transmitted together with the identification code of the mobile unit for calculating a reimbursement fee for each mobile unit transmitting data.

15. The method according to claim 11, further comprising the step of transmitting the section data file generated by a mobile unit immediately after motion of the mobile unit terminates.

16. The method according to claim 11, further comprising the step of transmitting the section data file generated by a mobile unit to a central computer after a predetermined time interval.

US 6,356,836 B1

19

**17.** The method according to claim 11, further comprising the step of transmitting via a central computer at least one overall route file to the mobile units according to predetermined criteria.

**18.** The method according to claim 17, further comprising the step of transmitting the overall route file automatically to the mobile units, preferably after a predetermined time interval.

**19.** The method according to claim 17, further comprising the step of transmitting the overall route file via a central computer to a mobile unit upon a request by the mobile unit.

**20.** The method according to claim 11, further comprising the steps of preparing and transmitting to a mobile unit, via a central computer, a recommended route calculated on the basis of the at least one overall route file stored in the central computer, if said central computer is so requested by said mobile unit, by transmitting at least a destination point.

**21.** The method according to claim 1, further comprising the step of terminating generation of the traveled distance data if motion of the mobile unit ceases.

**22.** The method according to claim 1, further comprising the step of determining absolute coordinates of the mobile unit using the Global Positioning System.

**23.** The method according to claim 1, further comprising the steps of recording and storing a time $T_i$ of arrival at a node $P_i$ of the traveled distance data in addition to recording and storing geographical coordinates $x_i$, $y_i$ in the storage device of the mobile unit.

**24.** The method according to claim 1, further comprising the steps of assigning and storing an absolute time of motion $T_{jk}$ to the sections $P_jP_k$ of the traveled distance data.

**25.** The method according to claim 24, further comprising the step of suppressing duration of non-movement of the mobile unit when determining the duration of motion $t_{jk}$.

**26.** The method according to claim 24, further comprising the steps of averaging the section data with respect to time of day, day of week, position of the day in the month, and the month and storing computed averages together with the frequency distribution of the durations of motion $t_{jk}$.

**27.** The method according to claim 24, further comprising the steps of saving, in a short term section data file stored in a short term storage device of said mobile unit, the most recent section data, said short term section data file containing actually realized durations of motions $t_{jk}$ relating to individual section data for a short past period.

**28.** The method according to claim 1, further comprising the steps of assigning and storing an actual duration of motion $t_{jk}$ to the sections $P_jP_k$ of the traveled distance data.

**29.** The method according to claim 28, further comprising the step of aggregating geographically identical sections of different motions of the mobile unit for predetermined time intervals of a duration of motion $t_{jk}$ in the section data file.

**30.** The method according to claim 28, further comprising the step of calculating mean values from the durations of motion $t_{jk}$.

**31.** The method according to claim 28, further comprising the steps of calculating a frequency distribution of the durations of motions $t_{jk}$ for periods which are identical to typical traffic conditions and assigning said frequency distribution to the section data $P_jP_k$.

**32.** The method according to claim 1, further comprising the step of determining the nodes $P_jP_k$ of a section $P_jP_k$ in accordance with the occurrence of a change in direction.

20

**33.** The method, according to claim 1, further comprising the step of determining nodes $P_jP_k$ of a section $P_jP_k$ so that said nodes lie at the intersection of sections running in different directions.

**34.** The method according to claim 1, further comprising the step of storing supplementary data, said data comprising at least periods of non movement of the mobile unit, in the section data.

**35.** The method according to claim 1, further comprising the steps of determining and saving the data within a vehicle representing a mobile unit.

**36.** A method for deriving destination tracking data from the data generated in accordance with claim 1, comprising:

    requesting a desired trip from a computer with knowledge
    of a section file;

    specifying said desired trip by inputting a starting point,
    a destination point, a starting or target time, and any
    special requirements;

    calculating via said computer a route composed of indi-
    vidual sections using the section file and minimizing
    the duration of motion or the route length taking into
    account any special requirements; and

    displaying the relevant data derived from the route deter-
    mined as described above in a display unit and/or
    outputting said data acoustically.

**37.** The method in accordance with claim 36, further comprising the step of using, when the computer calculates a route, the most recent section data stored in the short term section file together with the corresponding section data from the section file which does not deviate typically from the corresponding recent section data.

**38.** A device for carrying out the method according to claim 1, for use in at least one mobile unit comprising:

    a location sensor to determine the current geographical
    position of the mobile unit;

    a milometer to generate a route signal corresponding to
    traveled distance; an input unit;

    a display unit; and

    an electronic control device containing a microprocessor,
    a ROM and a RAM, said control device comprising:

    a motion storage unit;

    a section storage unit; and

    a section data file storage unit;

    said location sensor, said milometer, said input unit and
    said electronic control device being electrically con-
    nected to carry out said method.

**39.** The device according to claim 38 further comprising a short term section storage unit.

**40.** The device according to claim 39, further comprising a direction sensor provided to determine the current geographical direction of the mobile unit.

**41.** The device according to claim 38, further comprising a clock provided to generate time signals.

**42.** The device according to claim 38, wherein the input unit comprises a read unit to read an address information as a destination point from a data carrier.

**43.** The device according to claim 42, wherein said read unit is a facility for reading bar-codes.

**44.** The device according to claim 38, further comprising a transmission device built into the mobile unit for trans-

A83

US 6,356,836 B1

21

mitting collected data and a central computer installed in a remote location from the mobile unit, said computer receiving and evaluating the data transmitted by the transmission device of the mobile unit and thereafter storing the evaluated data.

**45**. The device according to claim **44,** wherein a receiving unit of the transmission device receives data from a central computer and an output device of the mobile unit outputs the data received from a central computer.

**46**. The device according to claim **44,** wherein the transmission device contains an interface.

**47**. The device according to claim **44,** wherein the transmission device contains a radio device.

**48**. The device according to claim **38,** further comprising a recording device for recording the time of starting and ending of a motion and/or the day of the week on which the mobile unit is moved.

22

**49**. The device according to claim **38,** further comprising a revolution detector for detecting the revolutions of a motor when said device is installed in a motor driven mobile unit.

**50**. The device according to claim **38,** further comprising a fuel level detector for detecting the fuel level of a motor driven vehicle when said device is installed in said vehicle.

**51**. The device according to claim **38,** wherein said direction sensor is a gyrometer and/or a compass.

**52**. The device according to claim **38,** further comprising a Global Positioning System receiver for detecting a current absolute position of the mobile unit.

**53**. The device according to claim **43,** wherein a central computer is part of a stationary navigational unit which in addition to the central computer contains a transmission device to receive and send data from and to a mobile unit and contains at least one storage unit.

\*   \*   \*   \*   \*

# United States Court of Appeals
## for the Federal Circuit
*TomTom, Inc. v. Michael Adolph,* 2014-1699

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by CLOUDIGY LAW PLLC, attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **October 10, 2014,** counsel has authorized me to electronically file the foregoing **Brief for Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Brian Himanshu Pandya
  bpandya@wileyrein.com
James H. Wallace, Jr.
  jwallace@wileyrein.com
Karin A. Hessler
  khessler@wileyrein.com
**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
*Counsel for Appellee TomTom, Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

October 10, 2014

/s/ Robyn Cocho
Counsel Press

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). As counted by the word processing program used to prepare it (Microsoft Word 2011), the brief contains 12,016 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14-point Times New Roman font.

Dated:  October 10, 2014                     Respectfully submitted,


                                             */s/ Antigone Gabriella Peyton*
                                             Antigone Gabriella Peyton
                                             **CLOUDIGY LAW PLLC**
                                             8300 Greensboro Drive, Suite 1250
                                             McLean, VA 22102
                                             (703) 436-2033